1996 SD 12

**LBM, INC. and Ronald J. Loftus,
Plaintiffs and Appellants,**

v.

**RUSHMORE STATE BANK,
Defendant and Appellee.**

No. 18882.

Supreme Court of South Dakota.

Considered on Briefs April 27, 1995.

Decided Feb. 7, 1996.

Robert F. LaFleur and Jon J. LaFleur of LaFleur and LaFleur, Rapid City, for plaintiffs and appellants.

Wayne F. Gilbert of Johnson Huffman, PC, Rapid City, for defendant and appellee.

McMURCHIE, Circuit Judge.

[¶ 1] Ronald J. Loftus (Loftus) and LBM, Inc. (LBM) brought an action against Rushmore State Bank (Rushmore) alleging the bank had breached a fiduciary duty during negotiations for the sale and the pursuant

release of a lien held by Rushmore on personal property located at the "Supreme Courts Racquetball Club" (Club) in Rapid City, South Dakota. Loftus and LBM claimed that due to Rushmore's actions in the disposition of the personal property, property in which Loftus and LBM still possessed a present ownership interest, Rushmore should be estopped from collecting the balance of the loan. The jury returned a trial verdict in favor of Loftus and LBM.

[¶ 2] On August 22, 1994, the circuit court entered a judgment notwithstanding the verdict in favor of Rushmore, holding that Loftus and LBM had divested themselves of all ownership in the property when they executed bills of sale in November 1987 to United National Bank (United National) and First Interstate Bank (First Interstate), United National's successor. We affirm.

## FACTS

[¶ 3] Loftus and other shareholders formed the LBM corporation in 1979 for the purpose of building and operating the Supreme Courts Racquetball Club, in Rapid City, South Dakota. The Club's real estate was financed through a down payment of $400,-000, while the $560,000 balance was funded through United National, via economic development bonds issued by the City of Rapid City. On March 13, 1980, United National obtained a mortgage on the real estate as security, which did not include equipment, machinery, or other personal property owned or leased by LBM.

[¶ 4] On March 27, 1980, LBM executed a lease agreement with Collateral Financial Services (CFS) to acquire athletic and office equipment for use in the Club. The original lease agreement did not contain an option to purchase. An addendum to the original lease executed on August 29, 1980, did grant LBM an option to purchase equipment of the lease and also listed Leola Loftus Allen (Leola), Loftus' mother, as one of the lease's guarantors. Subsequently, from September 8, 1980 to November 20, 1980, six lease supplements which encompassed the purchases of various athletic equipment and furnishings

were incorporated into the CFS/LBM lease agreement.

[¶ 5] On October 15, 1980, United National and LBM entered into an additional loan, which was separate and distinct from the real estate mortgage, to enable the purchase of more equipment. United National perfected a security interest in the loan by filing general financing statement # 096054 with the Secretary of State on October 17, 1980, listing LBM's inventory, equipment, furniture and fixtures as the property covered. Between April 30, 1981 and July 31, 1984, United National and its successor, Rushmore, entered into a series of renewal loans which included an influx of new funds with LBM for short term operating funds, business expenses and working capital. From the record, it appears that the series of loans were ultimately paid in full on February 1, 1985.

[¶ 6] On October 27, 1983, Leola exercised the option to purchase in the CFS/LBM lease agreement. CFS executed a bill of sale transferring ownership of the personal property to Leola. Subsequently, LBM and Leola entered into a lease agreement for the equipment obtained from CFS, with lease payments scheduled to begin on November 1, 1987.

[¶ 7] In July 1984, the Rapid City branch of United National was sold and became known as Rushmore State Bank. The Sioux Falls branch of United National (United National–SF) was not sold and it retained the real estate mortgage and loan which financed the purchase of the building and land for the Club. Rushmore purchased certain assets of United National in the sale, which included the LBM loans perfected by United National in 1980, secured by some of the personal property located at the Club.

[¶ 8] On or about February 6, 1985, Rushmore and LBM executed a security agreement for an LBM loan to be used for interest payment and loan consolidation. Rushmore perfected its interest by filing general financing statement # 259959 with the Secretary of State on February 12, 1985, listing "all cash, inventory, equipment, accounts and other rights to payment and all general intangibles, whether now owned or hereafter acquired" as the covered property. On August 9, 1985

Rushmore filed a continuation for financing statement # 096954 originally filed by United National on October 17, 1980. Rushmore again entered into a loan for renewal and consolidation with LBM on February 26, 1987.

[¶ 9] In 1987 LBM failed to make monthly real estate mortgage installments to United National and a foreclosure lawsuit was filed in the Seventh Judicial Circuit in Pennington County on June 22, 1987. However, on November 25, 1987, LBM, Loftus, his wife Cheryl, and Leola, entered into a Compromise and Settlement Agreement (Agreement) with United National–SF in regards to the foreclosure action. Pursuant to § 3, parts 1 and 2 of the Agreement, LBM, the Loftuses, and Leola agreed to sell and convey all interest it/they held in certain fixtures, equipment, and furniture to United National–SF and expressly warranted to United National–SF that each and every item of said property was free and clear of all liens, encumbrances, and claims of any and all third parties, except Rushmore. In conjunction with the Agreement, LBM, the Loftuses, and Leola executed bills of sale selling and conveying all interest held in the subject personal property to United National–SF.

[¶ 10] Although Rushmore was named as a party defendant and submitted a separate answer to the foreclosure complaint alleging a superior security interest in the personal property at the Club, it was not a party to the Agreement between United National–SF, LBM, the Loftuses and Leola. The Agreement in § 3, part 3, acknowledged that Rushmore "may" claim an interest in personal property conveyed by "LBM only," and that none of the parties conveying any interest "make any warranties as to the nature, extent or validity of any lien interest that Rushmore may claim or possess." Additionally, LBM's Bill of Sale also made no warranty as to any lien Rushmore may claim against any of LBM's personal property. Neither the Loftuses' or Leola's bills of sale mentioned the alleged Rushmore lien as to their property.

[¶ 11] On the same day of the Agreement and the bills of sale, November 25, 1987,

United National–SF and LBM entered into a lease agreement, leasing back to LBM all of the real and the same personal property. The lease included an option to purchase as per the term of the lease, six months. At this same time, United National–SF listed all of the Club's property for sale.

[¶ 12] Later in 1987, First Interstate purchased United National–SF, acquiring all the rights and interests previously procured from LBM, the Loftuses and Leola pursuant to the Agreement. On October 18, 1988, LBM and First Interstate entered into a lease agreement of the same real and personal property that did not include an option to purchase and terminated on March 31, 1989. First Interstate subsequently entered into a listing agreement with ERA on February 15, 1989.

[¶ 13] On January 31, 1990, Rushmore filed a continuance for financing statement # 259950 originally filed on February 12, 1985. LBM and Rushmore entered into a loan modification agreement on February 28, 1990. Less than two months later, Rushmore filed an amendment to financing statement # 259950 which included lists of equipment previously conveyed in LBM's, the Loftuses' and Leola's bills of sale to United National–SF.

[¶ 14] On July 11, 1990, First Interstate and Glen Plummer entered into a purchase agreement for the Club which encompassed all real estate and personal property owned by First Interstate. The purchase agreement provided that First Interstate would furnish Plummer with a clear title to all real and personal property. The fact that some of the Club's personal property may be subject to a lien held by Rushmore was not disclosed by First Interstate in the purchase agreement.

[¶ 15] Sometime thereafter, Plummer informed Loftus he had purchased the Club and its equipment. However, Loftus claimed he still owned the personal property subject to Rushmore's lien. Loftus then contacted a Rushmore bank officer who assured him of the validity of the bank's lien and advised him of the bank's awareness of the Plummer/First Interstate transaction. On September 5, 1990, Loftus provided a letter to Rushmore as per Rushmore's request, which read:

> I, Ronald James Loftus hereby authorize Rushmore State Bank to negotiate a settlement on my behalf for the sale of all equipment now located in the Supreme Courts Health Club at 2040 Jackson Blvd. I understand the entire debt is my responsibility and agree to continue payment as set forth by Rushmore State Bank.

[¶ 16] Loftus told Rushmore that he owned all of the collateral at that time.

[¶ 17] First Interstate threatened suit against Rushmore one week later and finally on September 18, 1990, Rushmore agreed with First Interstate to release its lien and extinguish its claim against the property in exchange for $12,500. On September 20, 1990, Rushmore applied the $12,500 towards Loftus and LBM's loan account.

## STANDARD OF REVIEW

[¶ 18] In reviewing the propriety of a judgment notwithstanding the verdict, this Court is required to view the evidence in a light most favorable to the jury verdict and must give the prevailing party the benefit of every inference and resolve in its favor every controverted fact. *Fajardo v. Cammack,* 322 N.W.2d 873, 875 (S.D.1982); *Carlson v. First Nat'l. Bank,* 429 N.W.2d 463, 466–67 (S.D. 1988); *BankWest Inc. v. Valentine,* 451 N.W.2d 732, 736 (S.D.1990). Regardless of whether a sufficiency of evidence question arises on a motion for directed verdict or a judgment n.o.v., it is decided by both the trial court and the appellate court under the same standard. *Kjerstad v. Ravellette Publications, Inc.,* 517 N.W.2d 419, 424 (S.D.1994)(citing *Fajardo, supra,* at 875). A judgment notwithstanding the verdict brings before the trial court a second review of grounds urged in support of a motion for directed verdict. *Fajardo, supra,* at 875; *Carlson, supra,* at 467. On appellate review, this Court in the resolution of sufficiency of evidence issues, should examine the record to determine only if there is competent and substantial evidence to support the jury's verdict. *Kjerstad, supra,* at 424 (citing *Holmes v. Wegman Oil Co.,* 492 N.W.2d 107,

111 (S.D.1992)). The trial court is compelled to base its judgment on the jury's verdict, unless it finds the verdict to be inherently erroneous. *Associated Press v. Heart of Black Hills,* 325 N.W.2d 49, 53 (S.D.1982). The trial court's decisions and rulings on this type of motion are presumed to be correct and this Court will not seek reasons to reverse. *Treib v. Kern,* 513 N.W.2d 908, 911 (S.D.1994).

[¶ 19] The issue this Court must ultimately address in the case at hand, is whether Rushmore breached a fiduciary duty it owed to any of the plaintiffs. However, prior to reaching that issue, we must first examine the evidence adduced at trial and answer two ancillary questions.

1) Whether Ron Loftus and LBM possessed any property interest, other than a lessee's interest, in the personal property Rushmore sold in lieu of the release of its security interest?

2) Did Rushmore, a secured party, have the right to release collateral described and perfected by a valid and filed financing statement?

[¶ 20] **I. Did Loftus and LBM possess any present property interest in the collateral Rushmore released its security interest on?**

[¶ 21] The record clearly reflects beyond any doubt that the personal property involved was sold by Loftus, LBM and others to United National–SF in the compromise and settlement agreement entered into as per the real estate foreclosure action. The Agreement stated:

LBM, Loftus, or Loftus Allen shall convey to UNB, free and clear of all liens, encumbrances, and the rights and claims of third parties, all of the equipment, furniture and fixtures described on Exhibit "A", attached hereto and incorporated fully herein by this reference. LBM, Loftus, and Loftus Allen hereby relinquish any and all claims of ownership or possession in said items and expressly warrant to UNB that each and every item of said property is free and clear of all liens, encumbrances, and the claims of any and all third parties; provided, that as to such conveyance by LBM, the parties acknowledge that Rushmore State Bank, Rapid City, South Dakota, may claim an interest in and to the equipment conveyed by LBM to UNB only, and neither Loftus, Cheryl A. Loftus, Loftus Allen, nor LBM make any warranties as to the nature, extent or validity of any lien interest Rushmore State Bank may claim or possess against UNB by virtue of the conveyance contemplated herein.

What portion of the property constituted Rushmore's collateral was in dispute, however, this is not material to the issues herein. It is clear that the property representing the collateral in this action is limited to the personal property owned initially by the parties to the compromise and settlement agreement, which property was subsequently sold, first to United National–SF, secondly to First Interstate, and finally by First Interstate to Plummer.

[¶ 22] The plaintiffs cannot bootstrap themselves into an ownership interest which is based upon Rushmore's security interest in collateral which arguably they may have had an interest in at one time. The plaintiffs' claim of ownership made to Rushmore in the Loftus letter and the list of property included in the last financing statement was false. Secondly, the plaintiffs cannot collaterally attack the present title of personal property conveyed under warranty to United National–SF, which was subsequently conveyed to First Interstate. When a compromise and settlement is entered into and accepted, "it constitutes a contract and, in the absence of fraud, it is binding on both parties." *Johnson v. Norfolk,* 76 S.D. 565, 82 N.W.2d 656, 659 (1957). The release of a good faith claim is sufficient consideration when offered in a compromise and settlement agreement. *Id.* The compromise and settlement of a suit may constitute an election of remedy and will preclude the plaintiff from bringing an action which is based upon a theory inconsistent with that upon which the former action was maintained. 25 AmJur2d § 19 at 661. "Separate actions against different persons cannot be maintained, where the maintenance of one necessitates the allegation of a fact or the assumption of a position inconsistent with the maintenance of the

other, and having elected to proceed on one assumption, he cannot proceed on the other, even though against a different defendant." *Wang v. Wang*, 447 N.W.2d 519, 523 (S.D.1989)(quoting *Schelske v. Smith*, 55 S.D. 502, 503–504, 226 N.W. 734 (1929)). The theory in this suit, that the plaintiffs had a present property interest in any of the property Rushmore sold is inconsistent, both factually and legally. Factually, the plaintiffs relinquished "any and all claims of ownership or possession" in the property they conveyed to United National–SF. Legally, the plaintiffs should not be allowed to proceed in this suit on the premise they still possess a present interest in said property, when in the prior foreclosure action they relinquished all ownership, title and possessory rights. The allowance of such a claim in this action would be the assumption of a theory that is inconsistent with their claims in the foreclosure suit.

[¶ 23] The evidence shows LBM, after the sale of property to United National–SF, leased the real and personal property back from United National–SF and then ultimately from First Interstate. The record is devoid of any evidence depicting a transfer of ownership from United National–SF or First Interstate back to any of the plaintiffs. Therefore, by a matter of law, the only present property interest LBM possessed was a leasehold interest, which is not the subject of this action.

[¶ 24] **II. Did Rushmore have the right to release collateral described and perfected by a valid and filed financial statement?**

[¶ 25] As noted in the Agreement, the personal property which the plaintiffs sold to United National–SF and all other property upon which Rushmore could arguably have a perfected security interest in, was subject to any security interest Rushmore may have held. It is uncontroverted that LBM's loans were not in default at the time in question, that Rushmore at no time took possession of the alleged secured collateral or that Rushmore at the time in question ever instituted an action for default of the LBM loans or the involved collateral.

[¶ 26] A perfected security interest is for the benefit of the creditor. SDCL 57A–9–406 provides: "A secured party of record may by his signed statement release all or part of any collateral described in a filed financing statement...." This right of release, absent a default, is not dependent upon the consent or acquiescence of the "debtor," who in this case is First Interstate as defined in 57A–9–105(1)(d), or the "account debtor," who in this case is LBM as defined in 57A–9–105(1)(a).

[¶ 27] **III. Did Rushmore breach a fiduciary duty it owed to any of the plaintiffs?**

[¶ 28] The existence of a security interest between a lender and a debtor per se does not create a fiduciary relationship. The relationship between a bank and its borrower is generally considered to be a debtor-creditor relationship "which imposes no special or fiduciary duties on a bank." *Waddell v. Dewey County Bank*, 471 N.W.2d 591, 593 (S.D.1991)(citing *Garrett v. BankWest Inc.*, 459 N.W.2d 833, 838 (S.D.1990)). This Court has previously established the elements which must be met to establish a fiduciary relationship between a bank and a borrower. The required elements include:

> 1) the borrower reposes faith, confidence and trust in the bank; 2) the borrower is in a position of inequality, dependence, weakness or possesses a lack of knowledge; and 3) the bank exercises dominion, control or influence over the borrower's affairs.

*Id.* at 593–94.

[¶ 29] As adduced by the evidence and stated previously, the plaintiffs conveyed all rights, title and interest in and to the personal property through the compromise and settlement agreement and the bills of sale to United National–SF. The defendant Rushmore was being sued by First Interstate for slander of title in and to the involved property. Rushmore had a decision to make as to the property First Interstate possessed and a serious question as to what portion of the said property was in fact their secured collateral.

[¶ 30] As shown earlier, the facts depict the plaintiffs had no ownership in the said property, they only held a leaseholder's right.

Nowhere in the facts is it shown that Rushmore exercised any dominion or control over the plaintiffs' affairs. The actions undertaken by Rushmore to negotiate the release of its security interest were the exclusive affairs of the bank.

[¶ 31] All other issues raised herein by the plaintiffs need not be addressed, as the plaintiffs failed to meet the burden of establishing a fiduciary relationship.

[¶ 32] In the words of the trial judge, "whatever amount was paid and credited against the loan was a windfall. A fiduciary obligation imports that there is an interest to protect. Here the only arguable interest left was RSB's security interest in the property the plaintiffs sold. [T]he security interest existed for RSB's protection, not the plaintiff's."

[¶ 33] MILLER, C.J., and AMUNDSON, J., concur.

[¶ 34] GILBERTSON, J., concurs with writing.

[¶ 35] SABERS, J., dissents.

[¶ 36] McMURCHIE, C.J., for KONENKAMP, J., disqualified.

GILBERTSON, Justice (concurring).

[¶ 37] I fully concur with the majority opinion. I write only to clarify my disagreement with the thesis of the dissent.

[¶ 38] The dissent argues the trial court overlooked the fact that LBM had leasehold rights in the property, even if it no longer had title or ownership rights. The dissent then relies upon SDCL 43–32–14 as a basis to continue LBM's property rights up to the time of the sale of the realty and personal property from First Interstate to Plummer.

[¶ 39] We have consistently held that failure to cite supporting authority waives an issue. SDCL 15–26A–60(6); see *Werner v. Norwest Bank South Dakota*, 499 N.W.2d 138, 141 (S.D.1993). LBM never cited to SDCL 43–32–14 as a basis for a property interest. However here, LBM must be forgiven as it never argued it had any property

interest based on its lease. LBM consistently argued that its property rights arose from the security interest it gave Rushmore State Bank. LBM defined the scope of its appeal as follows:

> LBM agrees that the single issue for the Court is whether LBM had a financial interest in the release of the valid and legally binding *security interest* that RSB held in the *personal property* located on the LBM premises. (LBM's Reply Brief at 1, emphasis added).

[¶ 40] In addition, it is clear that SDCL 43–32–14 cannot apply as it deals exclusively with leases of real property. Herein, the subject matter of this appeal is personal property.

SABERS, J. (dissenting).

[¶ 41] I dissent. This case was tried to a jury for two days on the basis that LBM had interests in the real and personal property resulting in a jury verdict of $130,000. That was the correct basis for trial because LBM *did have* rights in the property. Therefore, it was error for the trial court to grant judgment notwithstanding the verdict on the premise that LBM had no title or ownership rights in the property. The trial court overlooked the fact that at all material times, LBM had *leasehold rights* in the property, even if it no longer had title or ownership rights.

[¶ 42] LBM's most recent lease for the racquetball club was dated October 18, 1988. The lease terms indicated it was for six months, and at the end of six months, on March 31, 1989, LBM was to surrender the property. However, LBM continued to operate the facility until September 20, 1990, when Plummer purchased and took over. The lease agreement included both real and personal property and LBM had possession of both throughout that time.

[¶ 43] In the purchase agreement with Plummer, First Interstate Bank indicated LBM's lease expired June 30, 1990.[1]

[¶ 44] SDCL 43–32–14 provides:

> The closing date of this transaction shall be August 1, 1990, at which time Buyer shall

---

1. The purchase agreement provided:

If a lessee of real property remains in possession thereof after the expiration of the hiring and the lessor accepts rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding one year.

[¶ 45] Because LBM's lease was statutorily renewed at the end of each six-month period, LBM had leasehold rights in the racquetball club and equipment through September 30, 1990. After receiving authority from LBM to negotiate a settlement on his behalf for the sale of equipment,[2] Rushmore State Bank released its lien on the property in exchange for a mere $12,500 on September 18, 1990 without further notice to or the consent of LBM.[3] While the remaining leasehold rights may not be worth the amount necessary to pay LBM's loan in full, the trial court should have considered them and erred in ruling LBM had no loss.

[¶ 46] The trial court may have found the jury's award excessive based on the value of LBM's leasehold rights. However, the proper solution would have been for the trial court to grant a new trial if the verdict was influenced by passion or prejudice, or for LBM to consent to a reduction in damages. *Smith v. Highmore Farm Ltd. Partnership*, 489 N.W.2d 908, 914 (S.D.1992) (citations omitted).

obtain possession of the Real Property and the Personal Property; *provided, however, the parties acknowledge that the Real Property and Personal Property are presently in the possession of LBM, Inc. d/b/a the Supreme Courts Family Fitness Center pursuant to a lease agreement with Seller as lessor which expired June 30, 1990.* In the event LBM, Inc. fails or refuses to surrender the Real Property and Personal Property to Seller voluntarily on or before August 1, 1990, or in the event Seller is required to initiate legal action to regain possession of the Real Property or Personal Property, the Closing Date may be extended at the option of Seller until not later than October 1, 1990. (Emphasis added).

In other words, even the purchase agreement acknowledged the rights of LBM in the real property and the personal property and the necessity of obtaining their consent to release of said rights.

2. Loftus' letter to Rushmore State Bank, dated September 5, 1990, stated:

I, Ronald James Loftus hereby authorize Rushmore State Bank to negotiate a settlement on my behalf for the sale of all equipment now located in the Supreme Courts Health Club at 2040 Jackson Blvd. I understand the entire debt is my responsibility and agree to continue payment as set forth by Rushmore State Bank.

3. At the time Rushmore State Bank released its lien, LBM's outstanding loan balance was $144,681.98. Appraiser John Widdoss had estimated the value of the personal property within the racquetball club at $75,570.