#24906-a-DG

**2009 SD 38**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

NORVIL DYKSTRA, TWILA DYKSTRA,
MARVIN DYKSTRA, and JULIE
DYKSTRA,                                             Plaintiffs and Appellants,

v.

PAGE HOLDING COMPANY and FARMERS
AND MERCHANTS STATE BANK,                  Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
AURORA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIMOTHY W. BJORKMAN
Judge
\* \* \* \*

TIMOTHY R. WHALEN
Lake Andes, South Dakota
and
THOMAS E. ALBERTS
Avon, South Dakota                          Attorneys for plaintiffs
                                            and appellants.


ROBERTO A. LANGE of
Davenport, Evans, Hurwitz
  and Smith, LLP
Sioux Falls, South Dakota                   Attorneys for defendants
                                            and appellees.

\* \* \* \*

CONSIDERED ON BRIEFS
ON JANUARY 12, 2009

OPINION FILED **05/20/09**

#24906

GILBERTSON, Chief Justice

[¶1.] Norvil Dykstra, Twila Dykstra, Marvin Dykstra, and Julie Dykstra (Dykstras) sued Page Holding Company[1] and Farmers and Merchants State Bank (Defendants) for breach of a fiduciary obligation and intentional interference with a business relationship or expectancy. Defendants filed a motion for summary judgment, which was granted by the trial court. Dykstras appealed. We affirm.

## FACTS

[¶2.] Norvil (Norvil) Dykstra and Twila Dykstra (Twila), husband and wife, owned and operated a farm in Aurora County, South Dakota. Marvin Dykstra (Marvin) and Julie Dykstra (Julie), husband and wife, also owned and operated a separate farming operation in Aurora County. In addition, Norvil and Marvin were engaged in a joint venture cattle operation. Norvil and Marvin were also members of an entity known as Mudslingers, L.L.C. Both had eighth-grade educations and had farmed their entire lives.

[¶3.] Norvil began banking with Farmers and Merchants State Bank (Bank) in the mid-1980s. Norvil opened a checking account and obtained loans to finance his farming operation with the Bank. Ron Kristiansen served as Norvil's loan officer until Kristiansen's promotion to bank president in the mid-1990s.

[¶4.] Ed Fett (Fett) eventually took over as Norvil's loan officer. Fett was a college graduate and had completed some post-graduate work in addition to an

---

1. Page Holding Company was brought into the action on a theory of vicarious liability. All claims against Page Holding Company were dismissed on a motion for summary judgment. Dykstras did not appeal claims against Page Holding Company.

-1-

intensive banking course. Fett helped on his father's farm while in high school and the first two summers he attended college. Norvil, however, testified he was unaware whether Fett knew anything about farming. While serving as Dykstras' loan officer, Fett prepared Dykstras' financial statements for loan documentation purposes with information provided by Dykstras.

[¶5.] Norvil and Twila borrowed a substantial amount of money from the Bank through 2003 in an effort to expand their farming operation and maximize its profitability. The process for borrowing annual operating funds was the same each year. Norvil presented his farming operation plan to Fett at the beginning of the calendar year for approval, and then farmed in conformity with the annual plan. Loans included an operating line of credit, cattle line of credit, and installment loans for the acquisition of capital equipment. The annual operating line of credit and cattle line of credit were rewritten on March 1 of each year. Thereafter, Norvil and Twila would use their operating line of credit to pay farm expenses and then notify Fett of the expenditures. The expenditures would then be covered by the Bank and Fett would determine which loan to use for a particular payment.

[¶6.] Marvin and Julie's relationship with the Bank began in 1999 or 2000. Marvin had used Farmers State Bank of Stickney prior to that time, but moved his business after being told by a banker that Marvin was a poor operator. Marvin and Julie maintained a checking account and received several loans from the Bank through 2003 for their cow-calf operation.

[¶7.] The Bank retained a security interest in almost all of Dykstras' property and was over secured at the time the banking relationship started to sour.

Dykstras were not permitted to sell any property pledged as collateral unless the Bank first authorized the sale. The Bank, through Fett, also controlled the allocation of loan payments and expenses to either operating or cattle lines of credit or installment loans. The disbursement of loan proceeds was also controlled by the Bank, which had the effect of controlling which of Dykstras' bills were paid and when.

[¶8.]     During the time Norvil used the Bank as his primary banking institution, he also maintained other outside creditor relationships. Norvil maintained credit cards issued by other banks. He also obtained loans from other financial institutions for trading pickup trucks on a biannual basis, for financing for Mudslingers, L.L.C., a wind rower, and a tractor. Norvil and Twila also maintained a checking account at another bank.

[¶9.]     Similarly, Marvin and Julie maintained a checking account at another bank. In addition, Marvin obtained loans from other institutions for the purchase of a feed wagon, two tractors, as well as the biannual trading of pickups.

[¶10.]     Dykstras made decisions about what crops to plant, when to buy cattle, and managed the day-to-day operations of their respective farms. However, on occasion, Fett would direct Norvil to sell a crop based on the current price of that crop. When Dykstras were contemplating entering into a new Holstein venture, Norvil asked Fett to accompany the Dykstras to two meetings regarding Dykstras proposed Holstein venture and to a meeting on another possible new venture. Dykstras did so as the Bank would be lending the funds for the Holstein operation.

[¶11.]     Norvil had in the past purchased hedge contracts for his feeder pig operation in the 1990s. The Bank began requiring Norvil to obtain hedge contracts to secure a price on their cattle in order to protect the Bank's interests. Norvil asked Fett for permission to dispose of the hedge contracts in the spring of 2004, which Fett declined to do. Norvil testified that Fett said that as long as the Dykstras had money on loan from the Bank they would not be selling the contracts. These contracts constituted a portion of the Bank's collateral. Dykstras subsequently did not dispose of the contracts and were not able to realize the possible substantial gain on the contracts possible due to the price of cattle at that time.

[¶12.]     Prior to 2004, Norvil testified there were no specific problems with Fett. He further testified, however, that he told Kristiansen on at least two occasions that Norvil was more comfortable and preferred banking with Kristiansen. Norvil also testified he told Kristiansen he was never sure where he was with Fett because at times Fett would say one thing and then do another. However, no specific complaints were made to Kristiansen.

[¶13.]     The procedure and the banking relationship started to break down in 2004. In January 2004, Fett made a visit to Norvil and Twila's farm. During the visit, Fett told Norvil the bank would not loan him any more money to feed the calves currently in the yard. Fett told Norvil "he better sell the calves," which were approximately one-half the weight needed to turn a profit. Norvil sold the calves at a loss. Fett did not require the sale of the calves but his directive resulted in the sale given the Bank was Dykstras' only source of operating funds at that time.

[¶14.]      Fett made another visit to the farm in February 2004, at which time Norvil presented his farming plan and Fett gave an oral approval.  Fett advised Norvil of some irregularities in Norvil's loans but gave no details.  During a third farm visit in March of 2004, Fett advised Norvil and Twila that their loans had been "classified" by banking examiners.

[¶15.]      During this time frame, Fett advised Norvil that the overdraft policy at the Bank had changed and asked Norvil and Twila to sign a document regarding overdrafts.  Fett did not explain the document, and it appeared from the record that neither Norvil nor Twila read it.  The customary practice for Dykstras was to write checks for goods and services necessary for their farming operation with Fett's prior approval.  After writing the check, Norvil would advise Fett who then transferred funds into Norvil's farm checking account to cover checks written on the account.

[¶16.]      In May 2004, Norvil was confronted at the bank by Kristiansen and Fett and told that the Bank was terminating its banking relationship with Norvil and that all notes would be termed out.  The Bank returned two of Norvil and Twila's checks including a $9,600.00 check written for a fuel bill.  During that meeting, Fett told Norvil that Norvil's credit rating was "shitty."  Fett also told Norvil he wanted to see Norvil sweat and hoped that Norvil lost some sleep over the termination of his financing.  At a subsequent farm visit, Fett told Norvil that it "sucks" when you do not have any money.

[¶17.]      After the meeting, Norvil and Marvin sought to have Bank West refinance their entire outstanding debt with the Bank.  An FSA application filed by Bank West on behalf of Dykstras was declined.  Dykstras appealed the denial to the

United States Department of Agriculture, which affirmed the denial. As part of the refinancing effort, Bank West requested that the Bank subordinate certain of its prior lender security positions.

[¶18.] During the time Dykstras were attempting to obtain financing through Bank West, Fett assisted Dykstras with their financial statements and application to Bank West. In May of 2004 after Fett gave notice to Dykstras that the banking relationship was being terminated, Fett also obtained an application on behalf of the Dykstras for other financing through the local cooperative, assisted Norvil in completing the form, obtained Norvil's signature, and delivered the application to the local cooperative. Norvil testified that Fett had told him that Fett had submitted an FSA application on behalf of Dykstras after Fett advised Dykstras that Bank was terminating its relationship but during the time Dykstras were attempting to negotiate financing with Bank West. Norvil also testified that Fett claimed the FSA application was denied. Fett, however, later testified that he completed the application but did not file it as he had originally claimed. Fett said he did not follow through because he was unable to restructure Dykstras' debt load.[2]

[¶19.] Fett also required Dykstras to sign extension agreements on their past due notes with the Bank as a part of the agreement to subordinate the Bank's

---

2. Dykstras' FSA application was eventually filed with the assistance of Bank West and denied. The denial was upheld after Dykstras filed an administrative appeal. A Bank West loan officer testified that the FSA's denial was largely due to Dykstras' annual line of credit with the Bank. Rather than paying off the line of credit at the end of each year, it renewed annually with a balance due.

interests to Bank West. The Bank delayed agreeing to the subordination but ultimately acquiesced.

[¶20.] Bank West eventually declined to refinance the Dykstras' debt at the Bank. A line of credit with a maximum of $100,000 was extended to both Norvil and Marvin by Bank West. Dykstras were unable to secure financing from another institution. In 2005, while represented by counsel, Dykstras entered into a restructuring agreement with the Bank. Thus, instead of being dropped by the Bank due to these events, the banking relationship continued through this litigation.

[¶21.] In July 2005, Dykstras brought suit against the Bank alleging breach of a fiduciary duty, tortious interference with a business relation or expectancy, and negligent banking practices. The Bank moved for summary judgment on all three claims. After a hearing on the motion, the trial court granted the Bank's motion.

[¶22.] Dykstras appeal raising the following issue:

> Whether the trial court erred when it granted the Bank's motion
> for summary judgment on the breach of fiduciary duty claim and
> the claim for intentional interference with a business
> relationship or expectancy.

## STANDARD OF REVIEW

[¶23.] This Court's standard of review for evaluating a trial court's entry of summary judgment is well established:

> In reviewing a grant or a denial of summary judgment under
> SDCL 15-6-56(c), we determine whether the moving party has
> demonstrated the absence of any genuine issue of material fact
> and showed entitlement to judgment on the merits as a matter
> of law. The evidence must be viewed most favorably to the
> nonmoving party and reasonable doubts should be resolved
> against the moving party. The nonmoving party, however, must

> present specific facts showing that a genuine, material issue for trial exists.

Cowan Brothers, LLC v. American State Bank, 2007 SD 131, ¶12, 743 NW2d 411, 416 (quoting Rumpza v. Donalar Enter., Inc., 1998 SD 79, ¶9, 581 NW2d 517, 520).

## ANALYSIS AND DECISION

[¶24.]     "[T]he relationship between a bank and its borrower is generally considered to be a debtor-creditor relationship 'which imposes no special or fiduciary duties on a bank.'" *Id.* ¶26, 743 NW2d at 420 (quoting LBM, Inc. v. Rushmore State Bank, 1996 SD 12, ¶28, 543 NW2d 780, 785 (citing Waddell v. Dewey County Bank, 471 NW2d 591, 593 (SD 1991))). A successful banking relationship requires a customer to have a certain degree of trust and confidence in the bank. *Id.* ¶27, 743 NW2d at 421. However, it is a well established principle that commercial banks "owe their primary allegiance to their directors and stockholders." *Id.* (quoting McRedmond v. Estate of Marianelli, 46 SW3d 730, 738 (TennCtApp 2000)).

## A.     Breach of a fiduciary relationship claim.

[¶25.]     The trial court found there was no genuine issue of material fact with regard to the breach of fiduciary relationship claim. It further found that there were no facts to show that the Bank created a belief in Dykstras that the Bank had placed Dykstras' interests above its own.

[¶26.]     Dykstras argue on appeal that there are a substantial number of material facts in dispute. However, no specific facts were identified in their brief as

being in dispute.[3]  Instead, Dykstras argue that the trial court incorrectly applied the law to the facts, and that the trial court erred when it found the facts did not establish the first element of a breach of fiduciary duty claim: "the borrower reposes faith, confidence and trust in the bank."  *See id*. ¶26, 743 NW2d at 420.  Thus, our review on appeal is limited to determining whether the trial court correctly applied the law.  We do so using the facts as established in the record and consider those facts in a light most favorable to Dykstras as the nonmoving party.  *See id*. ¶12, 743 NW2d at 416.

[¶27.]        An ordinary debtor-creditor relationship may become a fiduciary relationship if the banking institution becomes in essence the trustee of its customer.  *Id*. ¶27, 743 NW2d at 421.  A fiduciary is defined as "[a] person who is required to act for the benefit of another person *on all matters within the scope of their relationship*."  Black's Law Dictionary (8thed. 2004) (emphasis added).

[¶28.]        In order for such a fiduciary relationship to be created, the bank must somehow create a belief in the customer that the bank has placed the customer's interests above those of the bank and of the bank's investors.  *Cowan Brothers,*

---

3.    The dissent suggests that Fett's claim that he had submitted an FSA application and the Dykstras' claim that he lied about the submission is a material fact that precluded granting the motion for summary judgment. The FSA loan application was supposedly filed by Fett *after* Bank notified Dykstras it was terminating the banking relationship.  The FSA application was not a material fact that indicated whether or not Bank had created a belief in the Dykstras that it had placed their interests above its own prior to terminating the bank relationship in May 2004.  There was testimony in the record that once the termination notice was given Dykstras no longer placed their faith, confidence, and trust in the bank.

*LLC*, 2007 SD 131, ¶27, 743 NW2d at 421. Only if the bank has created such a belief in the customer's mind will the bank owe a duty to act "primarily for the benefit of [the customer]." *Id*. ¶27 n6 (quoting *Garrett v. BankWest*, 459 NW2d 833 (SD 1990)). The duty is an onerous one that will not be imposed unless the customer had developed the requisite level of reliance or trust. *Id*.

[¶29.] The test for the existence of a fiduciary relationship between a banker and a debtor has three elements: "1) the borrower reposes faith, confidence and trust in the bank; 2) the borrower is in a position of inequality, dependence, weakness or lack of knowledge; and 3) the bank exercises dominion, control or influence over the borrower's affairs." *Id*. ¶26, 743 NW2d at 420 (citing *Waddell*, 471 NW2d at 593-94). All three elements must be established. *Id*. The existence of a fiduciary relationship is a question of law capable of resolution on a motion for summary judgment. *Id*. (citing *Garrett*, 459 NW2d at 839).

### 1. *The borrower reposes faith, confidence and trust in the bank.*

[¶30.] With regard to the law, Dykstras invite this Court to reconsider its holding in *Cowan*. Dykstras contend this Court's holding that the bank must somehow create a belief in the customer that the bank has placed the customer's interests above those of the bank and of the bank's investors is beyond the scope necessary to establish a breach of fiduciary claim. The only support offered for this argument is that *Cowan* goes much further than the requirements this Court formulated in *Garrett*. Dykstras argue that this Court did not adopt the classic trustee or fiduciary model in *Garrett* for a breach of banking fiduciary claim. Instead, Dykstras argue that all that must be shown is that the customer

"responses faith, confidence and trust in the bank." Dykstras then argue that they have shown that they placed their faith, confidence, and trust in the bank.

[¶31.]    Dykstras' argument on appeal differs substantially from their argument before the trial court at the hearing on the Bank's motion for summary judgment. At that hearing, Dykstras argued that the facts showed that Dykstras ran their respective farming operation, and that any input, advice, or requirements imposed by Fett were exclusively in the best interests of the bank and were detrimental to Dykstras. Dykstras then invited the trial court to create a new tort, the tort of banking malpractice or negligence, which the trial court declined to consider.

[¶32.]    While the facts do show that Dykstras placed some degree of confidence in Fett, they did so in terms of the banking relationship and not the farming operation itself. Norvil testified that he knew little about banking. However, Norvil also testified that he decided what crops to plant, where to plant the crops, what livestock to buy, and how to feed the livestock. Norvil testified that directives to sell a particular crop or livestock from Fett were not made due to market conditions to obtain maximum profits for Dykstras but rather to satisfy upcoming loan payments and due dates.

[¶33.]    The limitations and requirements on the sale and purchase of assets imposed upon Dykstras by Fett were designed to protect the Bank's interests and not Dykstras' interests. This is illustrated by Norvil's testimony concerning the cattle hedge contracts. Fett made it clear to Norvil when Fett refused to give his consent to the sale of the contracts that the Bank's interest in securing its loans was

superior to Norvil's interest in making money off of the hedge contracts. Similarly, when Fett directed Norvil to sell below market weight calves, Fett did so because the Bank refused to lend Norvil additional funds to finish the feeding process and instead wanted an immediate payment on the operating note.

[¶34.] Dykstras attempt to use these facts to show that Norvil and Marvin had faith and confidence in the Bank up until May 2004, because Dykstras never challenged or questioned Fett's directives. However, it is clear that the Bank's position as a secured lender gave it the ability to limit the sale or purchase of any assets for which it had loaned Dykstras funds. The Bank's actions were not in the nature of advice given to Dykstras as now claimed on appeal and in which they placed their faith and trust. These were instructions from a lender to a borrower on payments and limitations on loans.

[¶35.] Fett's conduct during the banking relationship gave Dykstras clear notice that the Bank's interests were superior to Dykstras' with regard to the directives given by Fett. Lacking any indication from the Bank that it placed Dykstras' interests above its own we cannot say that a fiduciary relationship was created.

[¶36.] Even if this Court were to adopt the more relaxed standard advocated by Dykstras and require only a showing of faith, confidence, and trust in the Bank, this element cannot be satisfied.[4] The record shows that Dykstras began to distrust

---

4. The standard proposed by Dykstras would convert most banking relationships into a fiduciary one. It would be unusual for a person to do business with a bank in which he or she did not have "faith, confidence and trust."

Fett as early as January 2004, when Fett directed Norvil to sell the under-weight calves as the Bank would not loan Dykstras any more money to feed the calves. Furthermore, Norvil conceded during his deposition that Fett's conduct from January through April 2004 was, in hindsight, not in Dykstras' best interests. Thus, at the time the Bank declined to finance Dykstras' farming operation in May of 2004, the level of trust Dykstras had in the bank had been severely eroded. Dykstras were at that time on notice that the dynamics of the banking relationship were changing and that there were issues with their loans even if Fett did not fully explain the meaning of classification, the irregularities with Dykstras' loans Fett reported in February 2004, or the change in the overdraft policy presented to Dykstras prior to the May 2004 meeting.

[¶37.] Dykstras failed to establish the first required element to show the existence of a fiduciary relationship between the Bank and Dykstras. Consequently, we need not review the second and third required elements. *See id.* ¶26, 743 NW2d at 420 (holding "[f]ailure to establish any one of the three required elements is fatal to the claim"). Without the existence of a fiduciary relationship, Dykstras claim of breach must fail.

## B. Intentional and unjustified act of interference with business relationship or expectancy.

[¶38.] Dykstras second claim was for intentional or unjustified act of inference with a business relationship or expectancy. Dykstras argued that the Bank interfered with their farming operation and their relationship with sale barns and other businesses with whom they would normally engage in business as well as interfering with Dykstras' relationship with Bank West. The trial court found that

Dykstras' second claim failed due to a lack of genuine issues of material fact as to

whether the Bank's conduct was unjustified. The trial court also found that

Dykstras failed to show they suffered damages as a result of the alleged

interference with a business relationship or expectancy.

[¶39.]    The plaintiff in a claim for tortious interference with a valid business

relationship or expectancy must prove the following essential elements:

> 1.    the existence of a valid business relationship or expectancy;
> 2.    knowledge by the interferer of the relationship or expectancy;
> 3.    an intentional and unjustified act of interference on the part of the interferer;
> 4.    proof that the interference caused the harm sustained; and,
> 5.    damage to the party whose relationship or expectancy was disrupted.

Table Steaks v. First Premier Bank, N.A., 2002 SD 105, ¶19, 650 NW2d 829, 835

(quoting Landstrom v. Shaver, 1997 SD 25, ¶73, 561 NW2d 1, 16). The intentional

and unjustified act of interference on the part of the interferer must be improper.

Gruhlke v. Sioux Empire Federal Credit Union, 2008 SD 89, ¶16, 756 NW2d 399,

408. Factors to be considered in determining whether the interference was

improper include:

> (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties.

Id. (citing St. Onge Livestock Co., Ltd. v. Curtis, 2002 SD 102, ¶16, 650 NW2d 537,

541-42 (quoting Restatement (Second) of Torts 767 (1979))). The section 767 factors

are neither exhaustive nor determinative of the issue of improper interference. *Id*. ¶16 n2, 650 NW2d at 542 n2.

[¶40.] In the instant case, Dykstras contend that it was improper for the Bank to discontinue lending money to feed the calves in January 2004 and force a premature sale of the cattle before they reached optimum market weight. Dykstras also contend it was improper for the Bank to delay in agreeing to subordinate its secured position to Bank West as part of the loan agreement negotiated by Dykstras to take their business to Bank West.[5]

[¶41.] The Bank was within its right as a lender to limit the disbursement of loan proceeds under the terms of the contract it maintained with Dykstras. Given that the Bank did not breach the terms of the contract or any banking laws and had a long standing history of approving and disapproving Dykstras' expenditures in order to protect the Bank's interests, we fail to see how exercising the same type of judgment in January 2004 amounted to unjustified conduct on the part of the Bank.

[¶42.] In addition, the Bank as a secured creditor did not have an obligation to subordinate its secured position to Bank West's. *See* First American Bank & Trust, N.A v. Farmers  State Bank of Canton, 2008 SD 83, ¶41, 756 NW2d 19, 31 (noting a creditor may assert whatever secured interest it may have in any collateral). Any delay in subordinating its interest cannot be viewed as improper given that the Bank was within its legal right to refuse to do so. The delay was

5. Fett's failure to file an FSA application on behalf of Dykstras does not serve as damages for this claim as Dykstras were unable to secure any FSA financing even when Bank West later filed an application on their behalf. *See supra* ¶17.

viewed as hostile conduct on the part of the Bank but Fett's motive to protect the Bank's loans and its assets was not in and of itself improper.

[¶43.] The trial court did not err when it concluded as a matter of law that there was no improper conduct on the part of the Bank. Because there was no improper conduct, we need not address the issue of damages.

[¶44.] Affirmed.

[¶45.] KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

[¶46.] SABERS, Retired Justice, concurs in part and dissents in part.

SABERS, Retired Justice (concurring in part, dissenting in part).

[¶47.] I respectfully dissent regarding the issue of breach of fiduciary duty. The facts taken in the light most favorable to the nonmoving party, in this case the Dykstras, demonstrate a genuine issue of material fact regarding whether Fett breached his fiduciary duty to the Dykstras by misrepresenting that he filed an FSA application on their behalf. Therefore, summary judgment was improper in this regard.

[¶48.] To support its motion for summary judgment, the Bank provided a statement of undisputed material facts, which provided in pertinent part: "Fett had worked with the Dykstras toward submitting an application for a Farm Services Agency guarantee, but the FSA officer on preliminary review of the financial information told Fett that the FSA could not grant the application for a guarantee because of the lack of a favorable cash flow." The Dykstras disputed this statement in their response: "Fett clearly lied about submitting an application for a guaranteed loan to the [FSA]. Fett represented to Plaintiffs' counsel and testified at

deposition that he had unsuccessfully tried to get an FSA guaranteed loan. However, Fett admitted at his deposition that he did not submit an application to FSA for or on behalf of either of the Dykstras." The trial court had notice of this dispute when it concluded as a matter of law that summary judgment was proper because "[t]here are no facts to indicate that the bank created a belief in [the Dykstras'] that it had placed the [Dykstras'] interests above its own." I disagree.

[¶49.] Under very similar facts, this Court previously affirmed a trial court's finding that a fiduciary duty existed between the customer and bank. In *Brandriet v. Norwest Bank*, 499 NW2d 613 (SD 1993), a bank official misrepresented to the customer that his application for a Veterans Administration (VA) loan was rejected by the VA because of insufficient income. In fact, the application had never been forwarded to the VA. On appeal, this Court observed that the "Brandriets placed their trust and confidence in Norwest to process the VA loan; Norwest officials were supposed to be acting with the Brandriets' interest in mind. Where such an exchange of trust and action exists, a confidential relation also exists." *Id.* at 618 (citing Schwartzle v. Dale, 74 SD 467, 471, 54 NW2d 361, 363 (1952)).

[¶50.] Viewing the substantially similar facts of this case in the light most favorable to the Dykstras, Fett exploited the faith, confidence and trust placed in him by the Dykstras. Under this same light, it could be concluded that Fett failed to act with the Dykstras' interest in mind. Whether this amounted to a breach of fiduciary duty should not have been dismissed by summary judgment as it depicts a genuine dispute of material fact. For these reasons, I dissent as to this issue.