IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

**FILED**
**May 13, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0144


TUG VALLEY PHARMACY, LLC; B & K PHARMACIES, INC.
d/b/a FAMILY PHARMACY; STROSNIDER DRUG STORE, INC.
d/b/a SAV-RITE PHARMACY; and DR. DIANE SHAFER
Defendants Below, Petitioners

v.

ALL PLAINTIFFS BELOW IN MINGO COUNTY
CIVIL ACTION NOS. 10-C-251, 11-C-332, 12-C-38, 10-C-252, 10-C-319, 12-C-39,
12-C-35, and 11-C-370,
Plaintiffs Below, Respondents


Certified Question from the Circuit Court of Mingo County
The Honorable John Cummings, Judge
Case Nos. 10-C-251, 11-C-332, 12-C-38, 10-C-252, 10-C-319,
12-C-39, 12-C-35, and 11-C-370

CERTIFIED QUESTION ANSWERED


Submitted:  March 4, 2015
Filed:  May 13, 2014


Michael M. Fisher, Esq.
Elizabeth S. Cimino, Esq.
JACKSON KELLY PLLC
Charleston, West Virginia
Attorneys for Tug Valley Pharmacy, LLC,
Samuel Randolph Ballengee, and
B & K Pharmacies, Inc., d/b/a Family
Pharmacy

James M. Cagle, Esq.
Charleston, West Virginia
Attorney for Respondents

David F. Nelson, Esq.
HENDRICKSON & LONG, PLLC
Charleston, West Virginia
Attorney for Strosnider Drug Store, Inc. d/b/a
Sav-Rite Pharmacy

Cecil C. Varney, Esq.
Williamson, West Virginia
Attorney for Diane Shafer, M. D.

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE BENJAMIN concurs and reserves the right to file a concurring opinion.
JUSTICES KETCHUM and LOUGHRY dissent and reserve the right to file dissenting opinions.

SYLLABUS BY THE COURT

1.      "The appellate standard of review of questions of law answered and certified by a circuit court is *de novo*."  Syl. Pt. 1, *Gallapoo v. Wal-Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).

2.      "A party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident."  Syl. Pt. 3, *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 341, 256 S.E.2d 879, 885 (1979).

3.      "Questions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them."  Syl. Pt. 6, *McAllister v. Weirton Hosp. Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983).

4.      Where a plaintiff has engaged in allegedly immoral or criminal acts, the jury must consider the nature of those actions, the cause of those actions, and the extent to which such acts contributed to their injuries, for purposes of assessment of comparative fault.

5.    A plaintiff's immoral or wrongful conduct does not serve as a common law bar to his or her recovery for injuries or damages incurred as a result of the tortious conduct of another.  Unless otherwise provided at law, a plaintiff's conduct must be assessed in accordance with our principles of comparative fault.

WORKMAN, Chief Justice:

This case is before the Court upon certified questions presented by the Circuit Court of Mingo County regarding whether the respondents/plaintiffs below (hereinafter "respondents") in the cases below may maintain causes of action against the petitioners/defendants below (hereinafter "petitioners") for allegedly causing or contributing to respondents' addiction to controlled substances, where respondents admit to engaging in criminal conduct associated with their acquisition and abuse of the controlled substances. Petitioners maintain that, as a result of respondents' admitted criminal conduct, their actions are barred entirely by the "wrongful conduct" rule and/or the doctrine of *in pari delicto*.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we conclude that any wrongdoing on the part of the respondents must be assessed under our long-standing precepts of comparative negligence and does not *per se* operate as a complete bar to their causes of action. Accordingly, we answer the first certified question in the affirmative and decline to answer the second certified question as it is mooted by the Court's response to the first certified question.[1]

---

[1] "'In a certified case, this Court will not consider certified questions not necessary to a decision of the case.' Syllabus Point 6, *West Virginia Water Serv. Co. v.* (continued . . .)

1

## I.     FACTS AND PROCEDURAL HISTORY

The twenty-nine individual respondents[2] filed a total of eight separate civil actions in the Circuit Court of Mingo County, alleging that the petitioners and others negligently prescribed and dispensed controlled substances causing respondents to become addicted to and abuse the controlled substances.  The suits were filed against several different combinations of the three petitioner pharmacies—Tug Valley Pharmacy, Strosnider Drug Store, and B & K Pharmacies—the Mountain Medical Center, and four physicians working at the Mountain Medical Center—Drs. Victorino Teleron, William Ryckman, Katherine Hoover, and petitioner Dr. Diane Shafer.[3]

Respondents were patients of the Mountain Medical Center and its physicians, most of them purportedly seeking treatment as the result of auto accidents or workplace injuries.  In the course of their "treatment" at the Mountain Medical Center, respondents were prescribed controlled substances, including Lortab, Oxycontin and Xanax, which they filled at the petitioner pharmacies and to which they allege that they became addicted, allegedly resulting in their admitted criminal abuse of the prescriptions

*Cunningham*, 143 W.Va. 1, 98 S.E.2d 891 (1957)." Syl. Pt. 7, *Shell v. Metropolitan Life Ins. Co.*, 181 W.Va. 16, 380 S.E.2d 183 (1989).

[2] Thirty-three individuals initially filed suit; four apparently did not pursue their claims.  Twenty-six of the respondents appear to be individual drug users and/or their representatives, while three appear to merely assert derivative claims.

[3] Only the petitioner pharmacies and Dr. Diane Shafer are participants in the proceedings before this Court.

and criminal activity associated with obtaining the drugs, as more particularly described *infra*. Ultimately, the Mountain Medical Center and their physicians were the subjects of an FBI raid which revealed violations of federal and state law for improperly prescribing controlled substances.[4] Certain of the physicians' medical licenses were revoked and some pled guilty to and served time for the federal offenses. Of the petitioner pharmacies, only Strosnider and its pharmacist, James Wooley, were subject to disciplinary and/or criminal action. Neither B & K nor Tug Valley were subject to discipline.

Most, if not all, of the respondents admit that their abuse of controlled substances pre-dated their "treatment" at Mountain Medical and even the existence of some of the petitioner pharmacies. All of the respondents admitted to engaging in most, if not all, of the following illegal activities associated with the prescription and dispensation of controlled substances while being provided services by the petitioners: criminal possession of pain medications; criminal distribution, purchase, and receipt of pain medications ("off the street"); criminally acquiring and obtaining narcotics through misrepresentation, fraud, forgery, deception, and subterfuge (not advising doctors of

---

[4] Evidence adduced below indicates that the Mountain Medical Center saw approximately 175 patients per day. Between the years of 2002 and 2010, Katherine Hoover was the highest prescriber of controlled substances to the effect of 355,132 prescriptions for controlled substances in West Virginia alone. However, we note that the appendix record on appeal is somewhat piecemeal and derived, in part, from newspaper articles of varying degrees of readability.

addiction or receipt of narcotics from other doctors); criminally obtaining narcotics from multiple doctors concurrently (commonly known as "doctor shopping"); and abusing and/or misusing pain medication by ingesting greater amounts than prescribed and snorting or injecting the medications to enhance their effects. Notably, during depositions conducted in the underlying cases, virtually all of the respondents asserted their Fifth Amendment privilege against self-incrimination, refusing to answer questions about other sources from whom they obtained controlled substances who were not licensed physicians.

Respondents, however, maintain that the medical providers acted "in concert" with the petitioner pharmacies, which pharmacies were well aware of the so-called "pill mill" activities of the medical providers. Respondents contend that the petitioner pharmacies refilled the controlled substances too early, refilled them for excessive periods of time, filled contraindicated controlled substances, and filled "synergistic" controlled substances which would provide an enhancing effect to the drugs. Moreover, respondents contend that the sheer volume of business derived from the "pill mill" facilities and physicians suggests an awareness of and joint endeavor in the improper activities of the medical providers.

On the basis of respondents' admissions of their own criminal activity associated with the prescription and dispensation of controlled substances by petitioners, petitioners moved for summary judgment asserting that respondents' claims were barred

4

as a matter of law.  In particular, respondents invoked the "wrongful conduct rule" as adopted in other jurisdictions, which stands for the proposition that a plaintiff may not recover when his or her unlawful conduct or immoral act caused or contributed to the injuries.  *See, e.g., Orzel v. Scott Drug Co.*, 537 N.W.2d 208 (Mich. 1995). Alternatively, petitioners argued that the doctrine of "*in pari delicto*" ("in equal fault") bars recovery. The circuit court concluded that the actions were not barred, but ordered that the following questions be certified to this Court pursuant to the Uniform Certification of Questions of Law Act, West Virginia Code § 51-1A-3 (1996) (2008 Repl. Vol.):

1) May a person maintain an action if, in order to establish the cause of action, the person must rely, in whole or in part, on an illegal or immoral act or transaction to which the person is a party?

2) May the doctrine of *in pari delicto* be employed as a bar to tort claims under West Virginia law?

## II.  STANDARD OF REVIEW

It is well-established that "[t]he appellate standard of review of questions of law answered and certified by a circuit court is *de novo*."  Syl. Pt. 1, *Gallapoo v. Wal-Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996).  With this standard in mind, we proceed to the issues presented.

5

# III. DISCUSSION

Simply put, these certified questions require the Court to determine whether it will adopt the "wrongful conduct rule"[5] adopted or codified[6] in some jurisdictions.

---

[5] The rule is also occasionally referred to as the "unlawful acts doctrine" or "serious misconduct doctrine."

[6] Many states have adopted statutory iterations of the rule including Alaska, California, Florida, Louisiana, Ohio, Oregon, and Texas. *See* Alaska Stat. § 09.65.210 (1997) ("A person who suffers personal injury or death or the person's personal representative under AS 09.55.570 or 09.55.580 may not recover damages for the personal injury or death if the injury or death occurred while the person was . . . engaged in the commission of a felony, the person has been convicted of the felony, including conviction based on a guilty plea or plea of nolo contendere, and the party defending against the claim proves by clear and convincing evidence that the felony substantially contributed to the personal injury or death[.]"); Cal. Civ. Code § 3333.3 (West 1997) ("In any action for damages based on negligence, a person may not recover any damages if the plaintiff's injuries were in any way proximately caused by the plaintiff's commission of any felony, or immediate flight therefrom, and the plaintiff has been duly convicted of that felony."); Fla. Stat. § 776.085 (1996) ("It shall be a defense to any action for damages for personal injury or wrongful death, or for injury to property, that such action arose from injury sustained by a participant during the commission or attempted commission of a forcible felony."); La. Rev. Stat. Ann. § 9:2800.10 (1996) ("No person shall be liable for damages for injury, death, or loss sustained by a perpetrator of a felony offense during the commission of the offense or while fleeing the scene of the offense."); Ohio Rev. Code Ann. § 2307.60 (West 2008) ("Recovery on a claim for relief in a tort action is barred to any person or the person's legal representative if any of the following apply:  The person has been convicted of or has pleaded guilty to a felony, or to a misdemeanor that is an offense of violence, arising out of criminal conduct that was a proximate cause of the injury or loss for which relief is claimed in the tort action."); Or. Rev. Stat. § 31.180 (1997) ("Felonious conduct of plaintiff as complete defense in tort actions"); Tex. Civ. Prac. & Rem. Code Ann. § 86.002(a) (West 1997) ("A claimant who has been convicted of a felony or misdemeanor may not recover damages for an injury sustained during the commission of the felony or misdemeanor if the injury would not have been sustained but for the commission of the felony or misdemeanor.").

We are cognizant of and expressly note that in its most recent session, our Legislature enacted a similar statute which would bar recovery for a plaintiff whose damages "arise out of the plaintiff's commission, attempt to commit or fleeing from the
(continued . . .)

This Court has not, contrary to the petitioners' contention, implicitly endorsed the wrongful conduct rule and has made only passing reference to the companion *in pari delicto* doctrine.[7] Petitioners argue that this Court should adopt a wrongful conduct bar which would bar entirely a claim where a plaintiff must rely on his or her illegal or immoral act to establish the cause of action. Respondents counter that such a rule merely rewards defendants' own wrongful and tortious conduct and that a plaintiff's conduct must be assessed according to our comparative fault concepts. We will examine the merits of each position in turn.

### A. The Wrongful Conduct Rule

The modern statement of the wrongful conduct rule urged by petitioners is contained in *Orzel,* as follows: "A person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral

---

commission of a felony criminal act insofar as the plaintiff is convicted of the felony." H. B. 2002, 2015 Leg. 82nd Sess. (W. Va. 2015) (effective May 25, 2015). However, the instant certified question, which asks this Court to adopt a common law version of the wrongful conduct rule, is unaffected by this enactment which is not yet effective as of the date this case was submitted to the Court or this opinion. *Cf. Dugger v. Arredondo*, 408 S.W.3d 825 (Tex. 2013) (analyzing potential availability of common law "unlawful acts doctrine" irrespective of availability of statutory affirmative defense to similar effect). The effect of this statute is simply not before the Court.

[7] While of similar origins, the doctrine discussed under the rubric of "*in pari delicto*" is typically reserved for contractual or transactional disputes, as opposed to tort claims. In fact, that is the lone context in which this Court has spoken to the principle. In *Workman v. Lewis*, 126 W. Va. 6, 28 S.E.2d 56 (1943), the Court briefly discussed *in pari delicto* in addressing an allegedly fraudulent transaction regarding an indebtedness. Beyond this scant discussion, this Court has not addressed the doctrine.

act or transaction to which he is a party." 537 N.W.2d at 212 (citations omitted); *see also Greenwald v. Van Handel*, 88 A.3d 467, 472 (Conn. 2014) (recognizing rule that a plaintiff "cannot maintain a tort action for injuries that are sustained as the direct result of his or her knowing and intentional participation in a criminal act."). The rationale typically argued in support of the rule is the "public policy that courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct." *Orzel*, 537 N.W.2d at 213; *see also Rimert v. Mortell*, 680 N.E.2d 867, 874 (Ind. Ct. App. 1997) (wrongful conduct rule "embodies the principle that one who is responsible for the commission of a criminal or wrongful act must exclusively bear his or her share of the responsibility for the act, and may not evade that responsibility either through gaining some profit for the act or shifting liability for the act to another"). There are four commonly cited reasons for barring such claims: 1) to avoid "condon[ing] and encourag[ing] illegal conduct"; 2) to prevent wrongdoers from profiting from their illegal acts; 3) to avoid damage to the public's perception of the legal system; and 4) preventing wrongdoers from shifting responsibility for their illegal acts to other parties. *Orzel,* 537 N.W.2d at 213; *see also Greenwald*, 88 A.3d at 477 ("[A]id is denied despite the defendant's wrong . . . to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination.").

Critics of the rule have deemed it "slippery and vexing," and have focused on the difficulty in formulating a comprehensive rule and its potential abuse or *ad hoc*

8

application.[8]  Moreover, courts dealing with this "controversial" rule have struggled to cohesively define what qualifies as "serious" misconduct such as to bar relief.  *Dugger*, 408 S.W.3d at 839 (Hecht, J., dissenting).  One commentator has noted that since "moral offensiveness is a patently subjective notion," application of the rule requires the court to "evaluate the plaintiff's conduct through a moral prism trained on an ever changing social landscape and climate[.]"  King, *supra* note 8, at 1051, 1076.  More importantly, however, it has been observed that once a flaccid rule is articulated, the rule essentially permits the court to substitute its judgment for that of the traditional fact-finder—the jury—and therefore "may also invite judges to vent their moral sensibilities or react to anticipated public indignation based on the moral flavor of the month."  *Id.* at 1072-73; *see also Dugger*, 408 S.W.3d at 841 (Hecht, J., dissenting) (recognizing that "[o]ne criticism of the unlawful acts doctrine, a criticism with substance, is that it does not have sufficient limiting principles").

Courts adopting the wrongful conduct rule have engaged in wide-ranging attempts to curb potential abuse or misapplication of the rule by requiring a high degree of causality between the wrongful conduct and the plaintiff's injury.  In *Price v. Purdue Pharma Co.*, 920 So.2d 479, 485 (Miss. 2006), the court attempted to articulate the

---

[8] *See* Joseph H. King Jr., "*Outlaws and Outlier Doctrines:  The Serious Misconduct Bar in Tort Law*," 43 Wm. & Mary L. Rev. 1011, 1076 (2002); *see also* Robert A. Prentice, "*Of Tort Reform and Millionaire Muggers:  Should an Obscure Equitable Doctrine be Revived to Dent the Litigation Crisis?*" 32 San Diego L. Rev. 53 (1995).

required nexus by stating that "[w]here the violation of law is merely a *condition* and not a *contributing cause* of the injury, a recovery may be permitted." (quoting *Meador v. Hotel Grover*, 9 So.2d 782, 786 (Miss. 1942) (emphasis added). The *Price* court echoed the common, but hollow, sentiment that plaintiff's claim is barred only if he "actually requires essential aid from his own illegal act to establish a claim[.]" *Id.* The scope and particulars of "essential aid" were not further enunciated.

Likewise grappling with a meaningful expression of the required degree of causal connection between the wrongful conduct and the injuries, some courts have broadly stated merely that such injuries must be a "direct result" of the wrongful conduct. *See Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.,* 621 So.2d 953, 955 (Ala. 1993); *Barker v. Kallash*, 468 N.E.2d 39, 41 (N. Y. Ct. App. 1984). Recognizing perhaps that such a description does little to aid in application of the rule, the *Orzel* court attempted to put a finer point on this vague incantation by stating that such claims are not barred where the act is "merely incidentally or collaterally connected with the cause of action[.]" 537 N.W.2d at 215 (citations omitted). The *Orzel* court further offered the following eloquent, yet unedifying, encapsulation: "The unlawful act must be at once the source of both his criminal responsibility and his civil right." *Id.* at 215 (quoting *Manning v. Bishop of Marquette*, 76 N.W.2d 75, 78 (Mich. 1956)). These efforts to toss additional verbiage at the rule to control its application have proven fairly unsatisfying. *See* King, *supra* note 8, at 1050 ("The facile words of the courts are no less satisfactory despite their confident, reassuring tone.").

10

In addition to the difficulty in meaningfully articulating the degree of causal connection required between the wrongful conduct and the injuries, the nature of the "wrongful conduct" required to implicate the rule has also been variably characterized. For example, the *Oden* court restricted its rule to bar actions for injuries resulting from "the injured party's knowing and intentional participation in a *crime involving moral turpitude*." 621 So.2d at 955 (emphasis added). In *Barker,* the court held that "when the plaintiff has engaged in activities *prohibited*, as opposed to merely *regulated*, by law, the courts will not entertain the suit[.]" 468 N.E.2d at 41 (emphasis added). However, the *Orzel* court held that the conduct must be "prohibited or *almost entirely* prohibited under a penal or criminal statute" as opposed to a "violation of a safety statute, such as traffic and speed laws or requirements for a safe work place" since such conduct does not "rise to the level of serious misconduct[.]" 537 N.W.2d at 214 (emphasis added).

Additionally, like most rules, the wrongful conduct rule is not immune to categorical exceptions. Many courts have found the rule inapplicable where 1) there is "inequality" between the parties such as where "plaintiff has acted '"under circumstances of oppression, imposition, hardship, undue influence, or great inequality of condition or age"'" or 2) there is a statutory basis for recovery. *Orzel*, 537 N.W.2d at 217-18 (citations omitted); *see also Rimert*, 680 N.E.2d at 874-75 (recognizing that "prohibition against imposing liability for one's own criminal acts to another through a civil action is simply not justified when a plaintiff is not responsible for the act or acts in question.");

11

*O'Brien v. Bruscato*, 715 S.E.2d 120 (Ga. 2011) (finding fact question of whether plaintiff knowingly committed a wrongful act precluded application of wrongful conduct rule); *Lee v. Nationwide Mut. Ins. Co.,* 497 S.E.2d 328, 329 (Va. 1998) (holding wrongful conduct defense "will be applied to bar recovery if the evidence shows that the plaintiff freely and voluntarily consented to participation in the illegal act, without duress or coercion").

In addition to the criticisms that the rule lacks "lucid, predictable, or workable standards," the purported justifications for the rule identified at the outset have also been deemed suspect. King, *supra* note 8, at 1017. First, the suggestion that the absence of such a rule allows a plaintiff to "profit" from his wrongdoing is misguided; if a plaintiff is injured as the result of someone's negligence, merely obtaining compensation for his loss does not constitute "profit." Secondly, the idea that precluding personal injury suits by those who engage in criminal conduct serves as a deterrent to such conduct lacks credulity. If the criminal penalties for such activity are insufficient, it is highly unlikely that such individuals will be deterred by the inability to bring a civil suit in the event they are injured and are further unlikely to appreciate any risk to themselves in participating in the criminal activity in the first instance.

Furthermore, the fear that the public will find recovery by those who engage in criminal conduct "unseemly" is a dangerous premise for adoption of the wrongful conduct rule. This notion is based upon the antiquated conceit that "[n]o

12

polluted hand shall touch the pure fountains of justice." *Collins v. Blantern*, 2 Wils. 341, 350, 95 Eng. Rep. 847, 852 (K.B. 1765). However, as one commentator observed, "this rationale ignores the countervailing contamination potential when the bar operates to confer immunity on an equally bad tortfeasor." King, *supra* note 8, at 1048; *see also* Prentice, *supra* note 8, at 122 ("[T]he moral characteristics of the parties before a court have little or no relevance to that court's capacity to do justice or injustice."). Our duty is to the rule of law, not public opinion. The archaic notion that the judicial system is unavailable to so-called "outlaws" has long-ago been supplanted by the concept of comparative fault, which plainly permits those with "polluted hands" to access justice in accord with the findings of the jury. The adoption of comparative fault further undermines the final rationale that the wrongful conduct rule must be utilized to prohibit the "shifting" of a wrongdoer's responsibility—the allocation of relative fault prevents inequitable "shifting" of personal responsibility.

The less-than-satisfying formulations of the rule and tenuous policy rationales notwithstanding, the broad concept of the wrongful conduct rule is, admittedly, superficially appealing. This Court is not so obtuse as to be unaware of the facially offensive premise that admitted criminal drug abusers should abdicate responsibility for their illegal conduct and make such conduct a source of income. Certainly this Court has, for the last thirty-six years, staunchly agreed with and adhered to the notion that "where a party substantially contributes to his own damages, he should not be permitted to recover for any part of them." *Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 341, 256

13

S.E.2d 879, 885 (1979). In fact, this concept is the basis of the Court's adoption of the modified comparative fault rule barring recovery for individuals who contribute fifty percent or more to their own injuries, as discussed more fully *infra*.[9]

However, as illustrated above, an attempt to transmute this concept into a *per se* "wrongful conduct" bar, subject to myriad considerations as to the type of conduct, causality of such conduct, and wholesale exceptions to application of the rule, nearly serves to obliterate the rule altogether: a sort of judicial "black hole" where the rule essentially collapses on itself. At best, attempting to accommodate all factual scenarios and policy concerns raised by the wrongful conduct rule make it virtually impossible to comprehensively articulate and therefore highly unlikely to be judiciously applied. In short, the wrongful conduct rule is "worse than an unruly horse; it is an imaginary one." Prentice, *supra* note 8, at 99. We will consider, then, the alternative.

### B. *The Role of Comparative Negligence*

The countervailing view to adoption of the wrongful conduct rule, as advocated by respondents, posits that a plaintiff's wrongful conduct is simply a matter to be evaluated by the jury under our system of comparative negligence. Respondents contend that matters of relative wrongdoing among the parties have long been and continue to be governed by West Virginia's principles of comparative negligence as set

---

[9] *But see* n.11, *infra*, regarding legislative modification to West Virginia's comparative fault scheme.

14

forth in *Bradley* and therefore must be apportioned by the jury rather than presenting a complete bar to the claim. From a policy standpoint, respondents argue that applying the wrongful conduct bar to their causes of action merely serves to reward and condone the actions of petitioners, which respondents claim were equally abhorrent to public policy and, in some instances, likewise criminal.[10]

As noted by one commentator, "[a]fter the adoption of comparative negligence . . . a rule that bars the claim of the immoral plaintiff potentially conflicts with the comparative negligence system of apportionment, which would only reduce damages." 1 Dan B. Dobbs, et al, *The Law of Torts* § 228, p. 816 (2011); *see also* King, *supra* note 8*,* at 1022 ("[M]any jurisdictions adopting comparative fault have opted for a modified version under which a plaintiff whose fault crosses a specified threshold is completely barred, thus obviating the need to invoke an independent serious misconduct bar to achieve a clean kill of the plaintiff's claim."). Regardless, however, courts which have adopted the wrongful conduct rule have attempted to square the rule with their respective formulations of comparative negligence by reasoning that public policy prohibits the claim in the first instance, leaving no claim to which comparative fault may be applied: "[R]ecovery is denied, not because the plaintiff contributed to his injury, but

---

[10] In fact, it may reasonably be argued that wrongdoing by highly-trained, licensed professionals, charged with the grave responsibility of the health and welfare of the public, may actually be considered more abhorrent. As previously noted, although petitioners make much of respondents' criminal conduct, petitioner Dr. Diane Shafer and pharmacist James Wooley were subjected to federal criminal charges, unlike most of the respondents as based upon the appendix record presented.

because the public policy of this State generally denies judicial relief to those injured in the course of committing a serious criminal act." *Barker*, 468 N.E.2d at 41. The *Barker* court further explained that "[t]he policy which applies to this case, has always existed independently from the rule of contributory negligence and its successor, comparative negligence" and that such a claim simply "[does] not demonstrate any cause of action cognizable at law" to which comparative negligence would be applicable. *Id*. at 43-44.

In essence, these courts have concluded that "*as a matter of law*, the plaintiff's fault exceeded the defendant's." King, *supra* note 8, at 1055 (emphasis added). However, as astutely noted, "[t]his kind of logic seems little more than a stealth version of comparative fault, but with the court in control rather than the jury." *Id*. Rather than endorsing this surreptitious transfer of the fact-finding obligations, other courts have reached the conclusion that plaintiff's alleged wrongful conduct is a matter best relegated to comparative fault standards. *See Dugger*, 408 S.W.3d at 830 ("Since Texas's shift to the proportionate responsibility scheme . . . most Texas courts have used a plaintiff's unlawful act to measure proportionate responsibility and reduce recovery, rather than completely bar the plaintiff from recovering damages."); *Sonoran Desert Investigations, Inc. v. Miller*, 141 P.3d 754, 761 (Az. Ct. App. 2006) (finding that "regardless of whether [plaintiff's] antecedent conduct was criminal in nature and whether it is characterized as contributory negligence or assumption of the risk" the claim is not barred due to plaintiff's criminal activity); *see also* Restatement (Second) of Torts § 889 (1979) ("One is not barred from recovery for an interference with his legally

16

protected interests merely because at the time of the interference he was committing a tort or a crime[.]").

As noted above, our rule of modified comparative negligence was first established by this Court in *Bradley*. The *Bradley* Court abolished our strict contributory negligence system wherein a plaintiff could not recover if he was even one percent at fault, in favor of a modified comparative negligence scheme wherein a plaintiff may recover unless his fault "equals or exceeds" the negligence of all other parties: "A party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident." Syl. Pt. 3, *id.* In discussing the inequity of a strict contributory negligence system which barred a slightly negligent plaintiff's claim outright, the Court noted: "[O]ur system of jurisprudence, while based on concepts of justice and fair play, contains an anomaly in which the slightest negligence of a plaintiff precludes any recovery and thereby excuses the defendant from the consequences of all of his negligence, however great it may be." *Id.* at 335, 256 S.E.2d at 882. Notably, the Court observed that a rule "that prohibits recovery to the plaintiff if he is at fault in the slightest degree is manifestly unfair, and in effect *rewards the substantially negligent defendant by permitting him to escape any responsibility for his negligence*." *Id.* at 341-42, 256 S.E.2d at 885 (emphasis added).

17

Since that time, the comparative fault concept has remained unchanged in West Virginia[11] and has in fact subsumed a great number of doctrines which, like the wrongful conduct rule, operated as a complete bar to plaintiff's recovery. *See Ratlief v. Yokum,* 167 W.Va. 779, 280 S.E.2d 584 (1981) (last clear chance); *King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511 (1989) (assumption of risk); *Moran v. Atha Trucking, Inc.,* 208 W.Va. 379, 540 S.E.2d 903 (1997) (sudden emergency).[12] As this Court observed in *Moran*, "the adoption of the comparative negligence rule meant that some well-settled tort doctrines developed in response to contributory negligence must now be modified or fall by the wayside altogether." 208 W. Va. at 385, 540 S.E.2d at 909; *accord Dugger*, 408 S.W.3d at 832 ("Proportionate responsibility abrogated former common law doctrines that barred a plaintiff's recovery because of the plaintiff's conduct—like assumption of the risk, imminent peril, and last clear chance—in favor of submission of a question on proportionate responsibility.").[13]

---

[11] *But see* House Bill 2002, 2015 Leg. 82nd Sess. (W. Va. 2015) (effective May 25, 2015) (to be codified at West Virginia Code §§ 55-8-13a through 13d) (modifying West Virginia's comparative fault scheme to bar recovery only where plaintiff's fault is *greater* than the combined fault of all other persons responsible for the damages).

[12] *See also Hersh v. E-T Enterprises, Ltd. Partnership*, 232 W.Va. 305, 752 S.E.2d 336 (2013), *superseded by statute*, Senate Bill 13, 2015 Leg. 82nd Sess. (W. Va. 2015) (to be codified at West Virginia Code § 55-7-27) (open and obvious).

[13] Even certain privileges, such as self-defense, which permit otherwise arguably criminal conduct, are subject to a jury's determination that such conduct was reasonable. *See Collins v. Bennett,* 199 W.Va. 624, 628, 486 S.E.2d 793, 797 (1997) ("[A] person who reasonably apprehends bodily harm by another is privileged under our law to (continued . . .)

The doctrine most similar to the wrongful conduct rule urged by the petitioners which ultimately gave way to a comparative fault analysis is assumption of risk. In Syllabus Point 2 of *King,* the Court eliminated the "complete bar" effect of assumption of risk, making it merely an aspect of comparative fault to be determined by the jury: "A plaintiff is not barred from recovery by the doctrine of assumption of risk unless his degree of fault arising therefrom equals or exceeds the combined fault or negligence of the other parties to the accident." 182 W. Va. 276, 387 S.E.2d 511. Similar to the criminal conduct at issue herein, the Court noted that assumption of risk was not mere carelessness, rather it was "venturousness": "*Knowledge* and *appreciation of the danger* are necessary elements of assumption of risk." 182 W. Va. at 280-81, 387 S.E.2d at 515-16 (quoting Syl. Pt. 5, *Spurlin v. Nardo*, 145 W.Va. 408, 417, 114 S.E.2d 913, 919 (1960)) (emphasis added). Like conduct subject to attack under "assumption of risk," immoral or illegal conduct certainly has the same earmarks of knowledge, willfulness, and appreciation of danger; the actor proceeds irrespective of the foolishness or illegality, respectively, of his or her conduct. This Court has made plain that such conduct does not bar the claim, but is to be considered by the jury and managed through the apportionment of fault.

---

exercise reasonable force to repel the battery. The amount of force used in defense must not be excessive and must be reasonable in relation to the perceived threat.").

Accordingly, this Court finds that our system of comparative negligence offers the most legally sound and well-reasoned approach to dealing with a plaintiff who has engaged in immoral or illegal conduct. We find that in cases where a plaintiff has engaged in allegedly immoral or criminal acts, the jury must consider the nature of those actions, the cause of those actions, and the extent to which such acts contributed to their injuries, for purposes of assessment of comparative fault. These are highly factual inquiries, all of which require the jury's venerable analysis and respected consideration. In the instant case, there is an obvious threshold factual question which perfectly illustrates the potential inequity in applying a wrongful conduct bar: did the respondents suffer from pre-existing addiction and abuse of controlled substances which was merely enabled and perpetuated by the petitioners' alleged conduct or was their addiction to and abuse of the controlled substances *a result* of the petitioners' conduct? *See Cowan Brothers, L.L.C. v. American State Bank*, 743 N.W.2d 411, 419 (S. D. 2007) (refusing to bar claim where plaintiffs assert their "alleged illegal acts are *a result of* the tortious conduct of [defendants]" (emphasis added)). These are complex factual issues that are not resolved by simply placing a "bad actor" tag on each of the parties and washing the courts' hands of the matter.

More importantly, it seems plain to this Court that "a broad unlawful acts doctrine could allow people who commit serious tortious conduct against others to have civil immunity merely because the claimant was not in compliance with every law at the time of the tortious conduct." *Dugger*, 408 S.W.3d at 835-36. We find untenable the

20

complete vindication of such alleged tortious conduct simply because plaintiff's conduct may have in some, as-yet-undetermined degree, contributed to his or her injuries. In advocating a wrongful conduct bar, this Court is set with the Hobson's choice of which conduct we greater prefer to deter—the immoral plaintiff or the tortious (perhaps egregiously so) defendant: "[W]here the injury arises directly out of the criminal wrongdoing, the key question is which approach will better deter criminal activity: (a) barring plaintiff's recovery, thereby encouraging *plaintiff* to obey the law, or (b) permitting plaintiff's recovery, thereby encouraging *defendant* to obey the law?" Prentice, *supra* note 8, at 112 (emphasis added). Relegating such determinations to our long-standing comparative fault system obviates the need for such a choice and leaves to the jury, fully versed on the facts and inter-relationship between the wrongful actors, the decision as to which conduct it, as a society, prefers to discourage.

Importantly, however, our rejection of the wrongful conduct rule in no way undermines our long-held principle that a plaintiff who substantially contributes to his own injuries cannot recover. Rather, our refusal to adopt the wrongful conduct rule simply venerates the well-established principle that

> "[q]uestions of negligence, due care, proximate cause and concurrent negligence present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable men may draw different conclusions from them."

21

Syl. Pt. 6, *McAllister v. Weirton Hosp. Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983) (citations omitted).  Moreover, we agree that while "[f]acially deeming persons unworthy may assuage the sensitivities of decision makers by masking the underlying societal dynamic that engendered the conduct," such a position undermines our tort system of compensatory justice and brings us "no closer to solutions."  King, *supra* note 8, at 1053. The wrongful conduct bar "allows selective resurrection of a contributory negligence defense under the cloak of the serious misconduct bar" and "legitimizes an avenue for the court to end-run the jury."  *Id* at 1066, 1067-68.  This Court cannot countenance a rule which "allows a defendant to profit from his own wrong in order to prevent plaintiff from profiting from hers[.]"  Prentice, *supra* note 8, at 92.  Such a rule connotes a lack of faith in our jury system and destabilizes our comparative fault construct which has faithfully served our State well for the last thirty-six years.  Without question, our citizenry is best equipped to weigh and speak to our society's tolerance for the panoply of wrongful conduct presented herein on all sides.[14]

Accordingly, we hold that a plaintiff's immoral or wrongful conduct does not serve as a common law bar to his or her recovery for injuries or damages incurred as a result of the tortious conduct of another.  Unless otherwise provided at law, a plaintiff's

---

[14] We are not unmindful of petitioners' concerns regarding respondents' assertion of their Fifth Amendment privilege against self-incrimination and problems of proof occasioned thereby.  However, we find that this is an issue to be managed in the trial court's discretion commensurate with this Court's admonitions regarding the invocation of Fifth Amendment privilege in the context of a civil matter.  *See State ex rel. Myers v. Sanders*, 206 W.Va. 544, 526 S.E.2d 320 (1999).

conduct must be assessed in accordance with our principles of comparative fault. We therefore answer the first certified question in the affirmative.

## IV. CONCLUSION

For the reasons set forth hereinabove, we answer the first certified question in the affirmative.

Certified Question Answered.