#24427, #24433-aff in pt & rev in pt & rem -DG

**2007 SD 131**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

COWAN BROTHERS, L.L.C.;
TIGH COWAN; TORK COWAN;
and TREG COWAN,                                    Plaintiffs and Appellants,

v.

AMERICAN STATE BANK,                              Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HYDE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JAMES W. ANDERSON
Judge

* * * *

MICHAEL J. SCHAFFER
PAUL H. LINDE of
Schaffer Law Office, Prof. LLC
Sioux Falls, South Dakota                         Attorneys for plaintiffs
                                                  and appellants.


J. CRISMAN PALMER
JASON M. SMILEY of
Gunderson, Palmer, Goodsell & Nelson, LLP
Rapid City, South Dakota                          Attorneys for defendant
                                                  and appellee.

* * * *

ARGUED AUGUST 28, 2007

OPINION FILED **12/19/07**

#24427, #24433

GILBERTSON, Chief Justice

[¶1.]        In their answer to a foreclosure action, Cowan Brothers, LLC, Tigh Cowan, Tork Cowan, and Treg Cowan (Cowans) initiated a counterclaim against American State Bank (ASB), asserting thirteen causes of action[1] arising out of the parties' lender/borrower relationship.  The circuit court granted ASB's motion for summary judgment on five of the causes of actions, one of which was breach of fiduciary duty.  However, in the alternative, the circuit court granted ASB's motion for summary judgment on all of Cowans' claims on the basis of illegality and *in pari delicto*.  Cowans now appeal the circuit court's order granting summary judgment on breach of fiduciary duty and the affirmative defenses of illegality and *in pari delicto*.[2]  We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

[¶2.]        The Cowans began their lending relationship with ASB around 1994.  The Cowans were young ranchers attempting to start a successful ranching operation.  The Cowans were also family friends of Bill Fischer (Fischer), the President and majority owner of ASB.

---

1.     The Cowans' causes of action included:  1) breach of contract; 2) breach of the covenant of good faith and fair dealing; 3) fraud and deceit; 4) breach of fiduciary duty; 5) negligent misrepresentation; 6) negligence; 7) tortious interference with business relationships and expectancies; 8) tortious interference with prospective business relationships; 9) slander of title; 10) intentional infliction of emotional distress; 11) negligent infliction of emotional distress; 12) prima facie tort; and 13) barratry.

2.     Cowans did not appeal the remaining portions of the circuit court's order granting ASB's motion for summary judgment on the following causes of action:  breach of contract; breach of covenant of good faith and fair dealing; prima facie tort; and barratry.

-1-

[¶3.]        Early in the relationship, the Cowans cared for Fischer's cattle year-round under a maintenance agreement.  Because of the harsh winter of 1996/1997, the Cowans encountered serious financial problems.  As a result, they incurred a significant increase in their costs in livestock maintenance fees.  When Tigh Cowan approached Fischer about the possibility of renegotiating his personal contract with the Cowans, Fischer refused.  Since then, the parties' relationship has grown increasingly hostile.  The Cowans contend that ASB has acted maliciously and oppressively towards them.  They also contend ASB has broken several promises that precipitated injury to their business reputation as well as its ability to perform.

[¶4.]        According to Cowans, after the severe winter of 1996/1997, ASB, through Fischer and its loan officer, Steve Kost, told the Cowans that they would be allowed to pay off their unpaid accounts.  Cowans contend, however, that in the spring of 1998, ASB reneged on that promise, informing them that their past due accounts payable would not be paid.  This resulted in a judgment against the Cowans and damage to the Cowans' business dealings with their other creditors.

[¶5.]        On December 1, 1998, ASB filed a foreclosure action as well as a Notice of *lis pendens*, which covered various property of the Cowans located in Hyde County.  Despite their increasingly contentious relationship, the parties were able to negotiate a loan agreement for 1999.  Pursuant to the 1999 loan agreement and an amended loan agreement in December 2003, Cowans claim ASB agreed to dismiss the foreclosure action and remove the *lis pendens*, but did neither.  This purportedly affected the Cowans' ability to obtain financing and made them "unbankable."

[¶6.] Cowans claim that Kost promised to make funds available for Tigh Cowan to pay his health insurance premium. ASB never made the funds available and Tigh lost his health insurance, which he claims he cannot re-obtain because of a pre-existing heart condition.

[¶7.] The 1999 loan agreement also included a number of other pertinent clauses. Included among those were clauses releasing both parties from claims arising out of the lending relationship, prohibiting the Cowans from borrowing from any other lender or transferring assets without ASB's permission, and stating that all business income and accounts receivable were to be applied to the loan. Each subsequent year from 2000 to 2003, the Cowans entered into a loan agreement with ASB that was substantially similar to the 1999 agreement.

[¶8.] Despite these agreements, beginning in 1998 and extending though the remainder of their lending relationship with ASB, the Cowans maintained a secret bank account known as the "Pony Express" at another bank. The "Pony Express" account money was used to pay a variety of the Cowans' expenses. Cowans contend that the creation of this account was necessitated by ASB's oppressive and malicious conduct that placed the Cowans in a precarious economic position.

[¶9.] In 2004, ASB refused to enter into a new loan agreement. Instead, in November of that year, ASB filed a Supplemental Complaint reinstating their foreclosure action, to which the Cowans filed a Separate Answer and Counterclaim. The Cowans' Counterclaim set forth thirteen separate causes of action against ASB

as well as a claim for punitive damages.[3]  After the ASB loan was paid off in June 2005, ASB's Complaint was dismissed.  With the dismissal of ASB's Complaint, the parties were recast with the Cowans as the party Plaintiffs and ASB as the party Defendant.

[¶10.]        On October 2, 2006, ASB filed a motion for summary judgment as to all of the Cowans' claims.  The circuit court concluded that although there were genuine issues of material fact surrounding many of the Cowans' claims, no genuine issues of material fact existed as to ASB's affirmative defenses of illegality and *in pari delicto*, and thus granted ASB's motion for summary judgment on all counts.  The court also granted ASB's motion for summary judgment as to the Cowans' claim for breach of fiduciary duty.  Cowans appeal.

[¶11.]        The parties have asserted a number of issues on appeal.  Many stem from ASB's notice of review, appealing the circuit court's order that denied the remaining issues of ASB's motion for summary judgment.  Because this part of the circuit court's order is not a final judgment and there has been no "express determination by the trial court that there was good cause to appeal," the issue is interlocutory and unappealable.  Big Sioux Twp. v. Streeter, 272 NW2d 924, 926 n1 (SD 1978); Brasel v. City of Pierre, 211 NW2d 846, 848 n3 (SD 1973); *see also* Nelson v. Menno State Bank of Menno, 220 NW 850 (SD 1928); SDCL 15-26A-3(1).  Therefore, we have no jurisdiction to adjudicate these issues.  The only remaining issues for this Court to consider are:

3.      Although many of the facts related to the Cowans' claims were fairly old, the circuit court determined the relevant statute of limitations were tolled by the initial 1998 foreclosure action brought by ASB.

1. Whether the circuit court erred in concluding that all of the Cowans' claims were barred by the defenses of illegality and *in pari delicto*.

2. Whether the circuit court erred in determining that ASB was entitled to judgment as a matter of law on the Cowans' claim for breach of fiduciary duty.

## STANDARD OF REVIEW

[¶12.] The standard of review for evaluating a circuit court's entry of summary judgment has been well established:

> In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we determine whether the moving party has demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists.

Rumpza v. Donalar Enter., Inc., 1998 SD 79, ¶9, 581 NW2d 517, 520 (internal citations and quotations omitted).

[¶13.] We will affirm the circuit court's ruling on a motion for summary judgment when any basis exists to support its ruling. Westfield Ins. Co., Inc. v. Rowe, 2001 SD 87, ¶4, 631 NW2d 175, 176 (citing Estate of Juhnke v. Marquardt, 2001 SD 26, ¶5, 623 NW2d 731, 732). However, summary judgment is not the proper method to dispose of factual questions. Harn v. Cont'l Lumber Co., 506 NW2d 91, 94 (SD 1993) (citations omitted). Only when fact questions are undisputed will issues become questions of law for the court. *Id.* (citations omitted).

## ANALYSIS

[¶14.] **1. Whether the circuit court erred in concluding that all of the Cowans' claims were barred by the defenses of illegality and *in pari delicto*.**

## A. Illegality

[¶15.]     ASB contends the Cowans not only materially breached the contract but also committed a crime in the process.  They contend that because of these alleged violations of law, Cowans have effectively forfeited any causes of actions stemming from the contractual relationship, even those sounding in tort.  We disagree.

[¶16.]     We begin our analysis by recognizing that this Court will not uphold illegal contracts.  Bayer v. Johnson, 400 NW2d 884, 886 (SD 1987) (stating, "Courts do not lend their aid to parties engaged in transactions in violation of law") (quoting Ferguson v. Yunt, 13 SD 120, 125, 82 NW 509, 510 (1900)).  However, if the illegal act is collateral to a lawful contract, this Court has never permitted total absolution of a party's contractual duties.  George P. Sexauer & Son v. Watertown Coop. Elevator Ass'n, 76 SD 381, 387, 79 NW2d 220, 223 (1957) (citations omitted).  In this case, ASB and Cowans' relationship began with a lawful financing contract.  At some point the continuing relationship was scarred by the alleged illegality of the Cowans in the maintenance of the secret "Pony Express" account.  However, the contract itself was never illegal.  The alleged illegal acts were only with reference to the Cowans' breach of the contract.  Absent the contract, the act of maintaining an account with another bank does not constitute any crime.  While the acts may have been illegal, they did not vitiate all responsibilities and obligations each party owed the other.

The crimes allegedly committed, 18 USC § 1344[4] and SDCL 44-1-12,[5] were enacted to protect banks from fraudulent debtors. The purpose of these statutes is to deter fraudulent conduct by a threat of a very sharp penal sword wielded by a federal or state prosecutor. ASB is attempting to pick up that sword and use it as a shield for its own actions in this case. This statute does not authorize such a defense nor does ASB cite any authority which supports this expansive proposition it now advances.

---

4.      18 USC § 1344 provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice--
(1) to defraud a financial institution; or
(2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

5.      SDCL 44-1-12 provides:

Any mortgagor or grantor of a security interest or other lien of personal property who, while the lien of his mortgage, conditional sales agreement, or security agreement remains in force and unsatisfied, willfully destroys, conceals, sells, or in any manner disposes of or materially injures any part of the property covered by such mortgage, conditional sales agreement, or security agreement without the written consent of the holder of such mortgage, conditional sales agreement, or security agreement, or who willfully abandons the property covered by such mortgage, conditional sales agreement, or security agreement without first giving written notice to such secured party of his intention to abandon such property, or who removes any part of the property covered by such mortgage, conditional sales agreement or security agreement from the county in which such mortgage, conditional sales agreement or security agreement is filed except temporarily in accordance with the usual and customary use of the same or similar kinds of property while the lien of his mortgage, conditional sales agreement or security agreement remains in force and unsatisfied without the written consent of the holder of such mortgage, conditional sales agreement, or security agreement, is guilty of a Class 6 felony.

-7-

Moreover, this Court was unable to find a single case where a bank or other lending institution was permitted to avoid tortious behavior based on a debtor plaintiff's violation of either of these statutes or any similar statute. The Legislature is fully capable of providing such a civil remedy or defense; however, they have omitted to provide one here. It is not within our province to enhance a penalty already enumerated by statute.

[¶17.]     In this case, we are presented with a slightly different question than the typical illegal contract defense. That question is: whether a tort claim may survive if the plaintiff was breaking the law at the time of the alleged tortious injury? This question does not have a simple answer. The defense of illegality, as applied to tort actions, still exists; however, "courts have long since discarded the doctrine that any violator of a statute is an outlaw with no rights against anyone." W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 36 (5th ed 1984). "[O]ne who violates a criminal statute is not deprived of all protections against the torts of others." *Id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 889 (1979) ("One is not barred from recovery for an interference with his legally protected interests merely because at the time of the interference he was committing a tort or crime"). A plaintiff does not transform into a "wolf's head–an outlaw" by simply violating the law. S.M. SPEISER ET AL., THE AMERICAN LAW OF TORTS § 5.14 (1983) (quoting Henwood v. Mun. Tramways Trust, 60 Astr CLR 438 at 466 (HC)).

[¶18.]     For a defendant to properly assert an illegality defense in a tort action, it must prove that the illegal act was the proximate cause of the injury. Beggerly v. Walker, 397 P2d 395, 401 (Kan 1964); *see also* Lee v. Nationwide Mut. Ins. Co*.,* 497

SE2d 328, 329 (1998) (stating "illegality defense is based on the principle that a party who consents to and participates in an illegal act may not recover from other participants for the consequences of that act"). If "the plaintiff was engaged in some act in violation of law that did *not* proximately contribute to the injury, then such circumstance does *not* preclude a recovery." S.M. SPEISER ET AL., THE AMERICAN LAW OF TORTS § 5.14 (1983) (emphases in original). The defense of illegality has been explained as such:

> To make good the defense [of illegality] it must appear that a relation existed between the act or violation of law on the part of the plaintiff, and the injury or accident of which he complains, and that relation must have been such as to have caused or helped to cause the injury or accident, not in a remote or speculative sense, but in the natural and ordinary course of events as one event is known to precede or follow another. It must have been some act, omission or fault naturally and ordinarily calculated to produce the injury, or from which the injury or accident might naturally and reasonably have been anticipated under the circumstances.

D. AVERY HAGGARD, COLLEY ON TORTS § 91 (4th ed 1932) (citation omitted).

[¶19.] This test requires a case-by-case analysis of facts to determine whether the illegal act has a causal connection to the complained of injury. *Beggerly*, 397 P2d at 401 (stating "[b]efore a wrongdoer is deprived of the law's protection, his illegal act must have a causal connection with his injury and if at the time of injury he was engaged in a breach of the law which did not proximately contribute to his damage, such circumstances will not preclude his recovery.").

[¶20.] ASB contends that the Cowans' alleged illegality was the proximate cause of their injury. They claim that by merely continuing a relationship through fraud, the Cowans subjected themselves to the resulting behavior of the bank.

Moreover, ASB claims that the siphoning of money from the Cowans' business perpetuated the appearance of insolvency, which eventually was the justification for calling in the loan. ASB contends that the Cowans' breaches affected their injuries; however, it fails to provide any causal link between the complained of conduct and the "Pony Express" account. Although ASB claims it would not have continued its relationship with Cowans if it was apprised of the secret account, this fact alone does not establish a causal relationship.

[¶21.] Specifically, ASB asserts that the Cowans siphoned off over $750,000 which was by the terms of the loan agreement, collateral for their ASB loan, and instead placed the money into the clandestine "Pony Express" account in another bank. However, the record does not appear to establish that ASB was ever under-collateralized despite the Cowans' actions. Further, the Cowans eventually paid off the entire loan by selling real estate.

[¶22.] Cowans contend that ASB's tortious conduct was the reason they set up the account. They claim the account was not the cause of the injury but rather an attempt at mitigating it. The Cowans highlight this fact by claiming ASB's oppressive and tortious behavior began prior to the account's formation. ASB does not establish as a matter of law any direct relationship between the amounts placed in the "Pony Express" account and the complained of torts. Moreover, the proximate cause inquiry is necessarily a fact-driven one. "[I]t must be a clear case before a trial judge is justified in taking these [proximate cause] issues from the jury." Luther v. City of Winner, 2004 SD 1, ¶24, 674 NW2d 339, 348 (quoting Mitchell v. Ankney, 396 NW2d 312, 313 (SD 1986)). ASB has failed to meet their

burden of proving the alleged illegal act was the proximate cause of the injury as a matter of law. As there are genuine issues of material facts in dispute regarding this issue, summary judgment was inappropriate.

## B. *In pari delicto* defense

[¶23.]    Cowans also contend that the trial court misapplied the doctrine of *in pari delicto* to this case.

> [T]he doctrine of *in pari delicto* is "based on judicial reluctance to intervene in disputes between parties who are mutually involved in wrongdoing," [] the fact that both parties to a lawsuit have committed wrongful conduct will not trigger the defense unless "the court is asked to do something that is itself part of the unlawful act."

Katun Corp. v. Clarke, 484 F3d 972, 978 (8thCir 2007) (quoting Brubaker v. Hi-Banks Resort Corp., 415 NW2d 680, 683-84 (MinnApp 1987)). In this case, Cowans are not requesting that this Court uphold their alleged illegal acts. They claim the alleged illegal acts are a result of the tortious conduct of ASB, asserting their wrongful conduct is wholly independent of the injuries they suffered. *In re Advanced RISC Corp.*, 324 BR 10, 13-14 (DMass 2005) (stating "the *in pari delicto* doctrine provides an affirmative defense which denies recovery to a plaintiff who bears fault for the claim"). The mere fact that a party may have been committing an illegal act while it is injured by another party's tortious behavior will not justify the defenses of *in pari delicto*. For the defense to be applicable, the court must be asked to further conclude that the illegal act, as a matter of law, falls within the scope of the sponsored sanction. As previously stated, ASB has failed to establish as a matter of law that the alleged illegal acts are the proximate cause of the Cowans' injury and claim.

[¶24.] Furthermore, the Black's Law Dictionary defines *in pari delicto* as: "In equal fault; equally culpable or criminal; in a case of equal fault or guilt. A person who is *in pari delicto* with another differs from [an accomplice] in that the former term always includes the latter, but the latter does not always include the former." Black's Law Dictionary 711 (5th ed 1979). Therefore, the *in pari delicto* doctrine is only appropriate where the parties acted in concert or conspired to commit a wrong. *See, e.g.,* Quick v. Samp, 2005 SD 60, 697 NW2d 741 (applying the doctrine of *in pari delicto,* this Court barred a suit for legal malpractice when the undesirable settlement was directly related to the plaintiff's participation with the lawyer in fabricating evidence); Massey Ferguson Credit Corp. v. Brice, 450 NW2d 435 (SD 1990) (wherein plaintiff conspired with defendant to defraud a third party; when the fraud fell apart, plaintiff attempted to sue defendant for indemnity on the fraudulent scheme, and this Court held that *in pari delicto* barred plaintiff's suit). Judge Posner succinctly described the doctrine of *in pari delicto* in *Williams Electronics Games, Inc. v. Garrity,* 366 F3d 569, 574 (7thCir 2004).

> The defense of *in pari delicto* is intended for situations in which the victim is a participant in the misconduct giving rise to his claim, *Pinter v. Dahl,* 486 US 622, 636, 108 SCt 2063, 100 LEd2d 658 (1988); *Crawford v. Colby Broadcasting Corp.,* 387 F2d 796, 798 (7thCir 1967), as in the classic case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together.

*Id.* (citing Note, "The Highwayman's Case," 9 LQ Rev 197, 197-99 (1893) (Everet v. Williams (Ex 1725)); Byron v. Clay, 867 F2d 1049, 1051-52 (7thCir 1989); Cisna v. Sheibley, 88 IllApp 385 (1899)). Here, there was no concert or conspiratorial motives between the parties in commission of the complained of wrongs. Each

parties' alleged sins were committed wholly independent of the others; therefore,

the defense of *in pari delicto* is unavailable under these facts.

[¶25.]      **2.     Whether the circuit court erred in determining that ASB was entitled to judgment as a matter of law on the Cowans' claim for breach of fiduciary duty.**

[¶26.]      Cowans contend the circuit court erred when it granted summary

judgment denying their claim based on a breach of fiduciary duty. This Court has

held that the relationship between a lender and a debtor does not automatically

create a fiduciary relationship. LBM, Inc. v. Rushmore State Bank, 1996 SD 12,

¶28, 543 NW2d 780, 785. Rather, the relationship between a bank and its borrower

is generally considered to be a debtor-creditor relationship "which imposes no

special or fiduciary duties on a bank." *Id.* (citing Waddell v. Dewey County Bank,

471 NW2d 591, 593 (SD 1991)). However, this Court has recognized that a fiduciary

duty may arise between a lender and a borrower if there is a relationship of trust

and confidence. *Garret v. Bankwest*, 459 NW2d 833 (SD 1990), is South Dakota's

seminal case considering this issue. In *Garret,* we established three elements which

need to be satisfied prior to the establishment of a fiduciary relationship between

the banker and a debtor. These three elements are:

> 1) the borrower reposes faith, confidence and trust in the bank;
> 2) the borrower is in a position of inequality, dependence, weakness or lack of knowledge; and
> 3) the bank exercises dominion, control or influence over the borrower's affairs.

*Waddell*, 471 NW2d at 593-94 (citing *Garret,* 459 NW2d at 838). Failure to

establish any of the elements is fatal to an establishment of the claim. *Id.* at 594.

Whether the relationship exists is a question of law, which is proper for summary

-13-

judgment. *Garret,* 459 NW2d at 839 (citations omitted). However, whether the relationship exists necessarily depends on facts. We review the trial court's order granting summary judgment "'based on written submissions in the light most favorable to the nonmoving party.'" Daktronics, Inc. v. LBW Tech Co., Inc., 2007 SD 80, ¶3, 737 NW2d 413, 416 (quoting Stanton v. St. Jude Medical, Inc., 340 F3d 690, 693 (8thCir 2003) (citing Wines v. Lake Havasu Boat Mfg., Inc., 846 F2d 40, 42 (8thCir 1988) (per curiam))). "Because the circuit court did not hear testimony or hold a fact-finding hearing, we are required to resolve factual disputes in favor of [Cowans]." *Id.*

[¶27.]     In this case, Cowans contend they have met all of these requirements. The Cowans claim they placed their faith, confidence and trust in ASB. They highlight this fact by noting that Steve Kost and Bill Fischer "admitted" that the Cowans placed their trust and confidence in ASB. However, if a bank representative does not believe its customers have trust and confidence in the banking institution, surely there is a fundamental problem with the bank's practices. Every person tendering their hard-earned money to a banking institution or entering a business relationship with a bank surely has or had trust and confidence in the entity. For a banking institution to become essentially the trustee of its customer, the institution must somehow create a belief in the customer that the entity has placed the customer's interests above itself, including even the interests of its investors.[6] *See* McRedmond v. Estate of Marianelli, 46 SW3d 730,

---

6.     In *Garret,* we defined a fiduciary relationship as follows:

(continued . . .)

-14-

738 (TennCtApp 2000) (noting that "[i]t is axiomatic that the officers and directors of a corporation owe a fiduciary duty to the corporation and to its shareholders."). *See also* Buxcel v. First Fidelity Bank, 1999 SD 126, ¶39, 601 NW2d 593, 603 (Konenkamp, J., dissenting) (noting commercial banks "owe their primary allegiance to their directors and stockholders"). In this case, Cowans have failed to establish this type of relationship ever existed, or if it did exist that it continued throughout the period of the alleged breaches. Indeed, Tigh Cowan stated in his deposition that the relationship "went from being a partnership . . . [to] opponents." Tigh emphasized, "[t]he trust was absolutely lost from our standpoint."

[¶28.]        Tigh's expiration of trust developed during the harsh winter of 1996/1997, amongst the harsher words of Fischer. The winter of 1996/1997 was a particularly hard time for the Cowans, as their accounts payable had begun to mount and become delinquent. They needed to generate more revenue. At the time, Fischer paid Cowans $18 a head per month to maintain his cattle, when he allegedly knew it was costing Cowans $55 to $70 per head to run the cattle. Tigh approached Fischer and requested that his contract be renegotiated to accommodate the harsh weather. Fischer allegedly became irate, stating: "[F]or all I've done for

---

(. . . continued)

> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another. . . .*

459 NW2d 833, 837 (emphasis in original) (citations omitted). For us to impart such an onerous duty upon a banking institution we must first establish that a corresponding reliance or trust had developed in the customer. In other words, it would be unjust for us to find a duty where one never was expected nor relied upon.

you guys, there is no way in hell that I'm going to pay any more money than what I'm paying you today." Cowans, who "considered Mr. Fischer the bank," claim that "from that day on" they were "opponents" with the bank. Therefore, by Tigh Cowan's own admission, they did not have trust or confidence in the bank after this 1997 confrontation.

[¶29.] All of the alleged breaches of duty, asserted by the Cowans, occurred after the Cowans claim to have lost trust in the bank. Indeed, the earliest alleged breach occurred in 1998 when the bank withheld money allegedly promised to the Cowans to satisfy some past due accounts payable. Furthermore, even the alleged promise to pay these debts occurred subsequent to the admitted falling-out; therefore, at no time during the earliest alleged breach did the Cowans harbor the requisite trust and confidence in the bank that would establish the first element required for a fiduciary relationship.

[¶30.] We also conclude that the Cowans have failed to establish that ASB stood in a position of advantage over the Cowans. ASB "did not have an advantage over [the Cowans] by way of business intelligence, knowledge of the facts involved, or mental strength." *Garret,* 459 NW2d at 839. Cowans readily concede in 1998 they opened up a clandestine bank account which they used to conceal approximately $750,000 from ASB. Treg Cowan testified:

Q. How about did you ever tell anybody at the American State Bank about the existence of the Wells Fargo Pony Express Account?

A. No.

Q. Is there a reason you didn't?

A. Well, sure. To me I understood why we had to do the Pony Express. I understood that it might have been wrong to do it, but I'm not going to cut the own hand that feeds my family.

Q. You knew that some of the proceeds that were going into the [other] bank were collateral pledged to the American State Bank?

A. Yes.

This is powerful evidence that the Cowans neither had trust nor confidence in ASB and could think and act independently for themselves. Moreover, it is clear there did not exist a degree of trust and confidence which would facilitate a fiduciary relationship.

[¶31.] Although ASB did exercise a substantial amount of control over the Cowans' business, as it might with any debtor that experiences financial problems that have the potential to negatively affect the bank, this alone will not create a fiduciary relationship. Cowans have failed to establish they "repose[d] faith, confidence and trust in the bank"; thus, their breach of fiduciary duty claim must fail. *Waddell,* 471 NW2d at 593 (citing *Garret* 459 NW2d at 838).

[¶32.] In conclusion, we reverse on the claims of illegality and *in pari delicto* and affirm on the claim of breach of fiduciary duty.

[¶33.] SABERS, KONENKAMP, and MEIERHENRY, Justices, and O'BRIEN, Circuit Judge, concur.

[¶34.] O'BRIEN, Circuit Judge, sitting for ZINTER, Justice, disqualified.