#28390-aff in pt & rev in pt-SRJ
**2018 S.D. 41**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ALEJANDRO GARRIDO, TANYA
HOOF, and TANYA HOOF as
limited conservator for the
minor child M.I.,       Plaintiffs and Appellants,

  v.

TEAM AUTO SALES, INC.,      Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT A. MANDEL
Judge

* * * *

HEATHER M. LAMMERS BOGARD
CHRISTOPHER A. CHRISTIANSON
STEPHEN C. HOFFMAN of
Costello, Porter, Hill, Heisterkamp,
  Bushnell & Carpenter, LLP     Attorneys for plaintiffs and
Rapid City, South Dakota      appellants.

GARY D. JENSEN
JESSICA L. LARSON of
Beardsley, Jensen & Lee, Prof LLC   Attorneys for defendant and
Rapid City, South Dakota      appellee.

* * * *

CONSIDERED ON BRIEFS
APRIL 16, 2018
OPINION FILED **05/23/18**

#28390

JENSEN, Justice

[¶1.] Alejandro Garrido and Tanya Hoof purchased a used vehicle from Team Auto Sales, Inc. (TAS), a used-car dealer. In this action, Garrido, Hoof, and Hoof's six-year old son, M.I., (Appellants) allege that the vehicle was sold without a muffler and that they suffered carbon monoxide poisoning from the vehicle. The circuit court determined that Appellants failed to generate a question of fact as to causation and granted TAS's motion for summary judgment on all claims. We affirm in part, reverse in part, and remand.

## Background

[¶2.] Hoof and Garrido were involved in a romantic relationship and lived together with M.I. and several other family members in Rapid City. After Hoof's personal vehicle became inoperable, she decided to purchase another one. On February 10, 2014, Hoof and Garrido went to TAS to search for a vehicle.

[¶3.] TAS showed Hoof and Garrido a 1991 Honda Accord it had for sale. The vehicle had over 180,000 miles on it, had been taken in on a trade, and was valued at $1,500. An employee of TAS took the car for a test drive, but other than cleaning it, TAS had not inspected or done any other work on the vehicle. Hoof and Garrido acknowledged that they knew the car would likely have mechanical issues, however, Garrido planned to fix whatever was wrong. The vehicle had to be jump-started before it could be test driven. Hoof and Garrido took the vehicle for a short drive around the block. Hoof noticed that the vehicle smelled of gasoline and that it sounded like a lawnmower when running. Garrido observed that the vehicle was louder than what he would have expected from a vehicle with its original exhaust

system intact. Neither Hoof nor Garrido discussed the smell or noise with anyone at TAS. Garrido also came back and drove the vehicle a second time before purchasing it.

[¶4.]      Hoof paid the $1,500 purchase price for the vehicle and Garrido signed the purchase order. The agreement stated that the vehicle was being sold "**AS IS– NO WARRANTY**." The TAS salesman claimed that he had explained the terms of the agreement to Garrido, that he had told Garrido he should have the car inspected, and that the car was being sold "as is" without any warranties. Garrido understood he was purchasing the vehicle without any warranties and that he could have had the vehicle inspected before purchasing it.

[¶5.]      In the following weeks, Hoof complained that the smell of exhaust coming from the vehicle was giving her headaches. Garrido thought the car may have had an exhaust leak. He checked under the hood but could not locate any leaks and did not observe a missing muffler. Hoof and Garrido continued to drive the vehicle and dealt with the exhaust smell by driving with the windows open. Hoof and Garrido did not have the car inspected by a mechanic, but the oil was changed approximately one month after the purchase. The oil-change shop noted several fluid leaks, but did not list the muffler as missing.

[¶6.]      On March 31, 2014, Hoof and M.I. were both admitted to the emergency room. M.I. had been coughing and wheezing for approximately two days before the ER visit and was prescribed a nebulizer to treat his symptoms. Hoof was having issues with anxiety, had difficulty breathing, and had been coughing. She had also claimed to have been physically assaulted by Garrido the previous night.

Hoof was prescribed Valium and released. There is no evidence connecting this episode with the carbon monoxide poisoning the next day.

[¶7.]        On April 1, 2014, 50 days after purchasing the vehicle, Appellants took the vehicle to look at an apartment they were considering renting. When they arrived at the apartment complex, the three stayed inside the vehicle for 30 to 45 minutes while waiting for the landlord to show them the apartment. The vehicle was parked and running throughout this time. The vehicle's windows were open most of this time. However, Appellants closed the windows when it started to rain. When the landlord arrived, all three left to go inside. Garrido claimed that as M.I. got out of the car, he fell. Garrido picked M.I. up and asked if he was okay. M.I. said no and that he was not feeling well. Garrido carried M.I. over his shoulder while looking at the apartment.

[¶8.]        After the apartment tour, M.I. indicated he was feeling better. However, after M.I. got back into the vehicle, he began seizing. Hoof and Garrido rushed M.I. to the emergency room at Rapid City Regional Medical Center. By the time they arrived, M.I. had stopped seizing but was not breathing. The admitting physician suspected M.I. was suffering from carbon monoxide poisoning because he had no history of seizures and smelled of exhaust fumes. M.I.'s carbon monoxide levels were checked immediately and were found to be toxic at 45 parts per million (ppm). Hoof and Garrido's carbon monoxide levels were also checked and registered 29 ppm and 26 ppm respectively. All three were diagnosed with carbon monoxide poisoning and placed in hyperbaric oxygen chambers for treatment.

[¶9.]      After Appellants arrived at the hospital, the Rapid City Fire Department was called to inspect the Honda.  The Fire Department unit that specialized in handling carbon monoxide incidents was unavailable, so another unit with limited experience in handling such incidents responded.  This unit arrived 20 minutes later and completed a carbon monoxide test of the vehicle's passenger compartment approximately 38 minutes after the vehicle was vacated by the Appellants.  The tests showed that carbon monoxide was present in the passenger compartment at the level of 16 ppm.  This was within a range generally considered non-toxic and would not cause an acute carbon monoxide exposure based on the length of time Appellants reported being in the vehicle.  First responders noticed a smell of gas, that the vehicle did not have a muffler, and that the end of the exhaust pipe was positioned near the rear seat.  The first responders started the vehicle and ran it for two minutes with all the doors and windows closed.  Because the vehicle compartment still registered 16 ppm after two minutes, no further action was taken with respect to the vehicle.  Garrido installed a muffler on the vehicle shortly after the April 1, 2014 incident.

[¶10.]      Appellants filed a complaint against TAS seeking damages for carbon monoxide poisoning they alleged was caused by the absence of a muffler on the vehicle.  The complaint asserted TAS was liable for damages on the theories of strict liability, negligence, negligent misrepresentation, intentional misrepresentation, negligent infliction of emotional distress, intentional infliction of emotional distress, breach of contract, breach of express warranty, and breach of implied warranty.  TAS motioned for summary judgment, arguing that the claims should be dismissed

as a matter of law and that the evidence was insufficient to establish causation as a matter of law.

[¶11.] At the April 24, 2017 summary judgment hearing, the circuit court expressed concern with causation and the theories of liability. The circuit court deferred ruling on the motion and granted Appellants' request for a continuance to obtain additional expert testimony on causation. Appellants obtained an expert report from Joseph Tjaden, a paramedic and Captain of the Rapid City Fire Department Hazardous Materials Response Team. Tjaden was not present at the April 1, 2014 incident but headed the unit that normally handled carbon monoxide incidents. In his deposition, Tjaden stated:

> Vehicle exhaust contains dangerous materials, with [c]arbon [m]onoxide being the dominant material which has acute impact on the body. . . . This is a primary reason that vehicle exhaust exists above the cabin or behind the rear wheels, to help keep the exhaust away from vehicle openings. Carbon [m]onoxide is a colorless, odorless gas present in the combustion of fossil fuels and incomplete combustion of natural materials.

Tjaden also concluded that M.I.'s symptoms were "consistent with an acute exposure [to] high quantities of [c]arbon [m]onoxide," and found evidence that M.I. was "feeling sick on the way to the apartment viewing, the fall and weakness at the apartment, the [testimony that M.I.] possibly felt better in fresh air, but the ill feeling increased upon returning to the vehicle" constituted a "strong" indication that "the vehicle was the cause of the poisoning." Tjaden also concluded that having the car parked in one place with the muffler missing and windows open for an extended time would allow carbon monoxide to enter the vehicle and cause the high levels of exposure Appellants displayed at the hospital. He also opined that because

the exhaust pipe of the vehicle ended near the rear seat, it was more likely that exhaust had enveloped the interior of the vehicle. Tjaden also noted that carbon monoxide can dissipate rapidly when not in a contained environment and that the opening of the vehicle's doors at the hospital by Appellants and the fire department, combined with the breeze on the day of the incident, would have caused the carbon monoxide levels in the vehicle to quickly lower when the engine was not running. Tjaden also suggested that the unit responding to the incident erred because it tested the vehicle running with the doors and windows closed, which did not recreate the situation that existed when Appellants were sitting in the vehicle with the windows open for 30 to 45 minutes.

[¶12.]     Appellants also designated one of their treating physicians, Dr. Brooke Eide, as an expert witness. TAS noticed the deposition of Dr. Eide on March 20, 2017. His deposition was held on March 21, 2017. Dr. Eide testified that Appellants all experienced carbon monoxide poisoning and that the exposure was caused by exhaust based on the fact that the initial treating doctor could smell exhaust fumes emanating from M.I. upon his arrival at the hospital. Dr. Eide charged $500 per hour for his services. TAS paid $375 for the three-quarter hour deposition time for Dr. Eide but refused to pay for any other time billed by Dr. Eide before or after the depositions.

[¶13.]     TAS renewed its motion for summary judgment and scheduled the motion for hearing. The circuit court granted summary judgment determining that Appellants failed to present evidence that the missing muffler caused the carbon

monoxide poisoning. After determining there were no genuine issues of material fact as to causation, the circuit court did not reach the issues of liability.[1]

[¶14.] At the summary judgment hearing, Appellants moved for the circuit court to require TAS to pay $2,000 of Dr. Eide's bill for time that Appellants claimed was attributable to providing the discovery requested by TAS. The court denied the motion and determined that TAS was not responsible for that amount. Appellants appeal, raising the following issues for our review:

> 1. Whether the circuit court erred in granting TAS's motion for summary judgment on the basis that there was insufficient evidence to prove causation.

> 2. Whether the circuit court erred in denying Appellants' request for fees incurred by their expert in preparing for a deposition noticed by TAS.

### Standard of Review

[¶15.] "Our standard of review on a grant or denial of summary judgment under SDCL 15-6-56(c) is well settled." *McKie Ford Lincoln, Inc. v. Hanna*, 2018 S.D. 14, ¶ 8, 907 N.W.2d 795, 798.

> Summary judgment is proper where, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. We will affirm only when no genuine issues of material fact exist and the law was applied correctly. We make all reasonable inferences drawn from the facts in the light most favorable to the non-moving party. In

---

1. Appellants argue in their brief that the circuit court erred in granting TAS's motion for summary judgment on their claims for negligence, breach of implied warranty, strict liability, intentional misrepresentation, and intentional infliction of emotional distress. Because the circuit court did not rule on the liability issues alleged by each of the three Appellants, we decline to address them.

addition, the moving party has the burden of clearly demonstrating an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.

*Id.* (citations omitted) (quoting *Hofer v. Redstone Feeders, LLC*, 2015 S.D. 75, ¶ 10, 870 N.W.2d 659, 661-62).

### Analysis

### 1. Whether the circuit court erred in granting TAS's motion for summary judgment on the basis that there was insufficient evidence to prove causation.

[¶16.]     "Proximate cause is defined as 'a cause that produces a result in a natural and probable sequence and without which the result would not have occurred.'" *Howard v. Bennett*, 2017 S.D. 17, ¶ 7, 894 N.W.2d 391, 395 (quoting *Hamilton v. Sommers*, 2014 S.D. 76, ¶ 39, 855 N.W.2d 855, 867). "This Court has further defined proximate cause as 'an immediate cause and which, in natural or probable sequence, produced the injury complained of. Furthermore, for proximate cause to exist, the harm suffered must be found to be a foreseeable consequence of the act complained of.'" *Hamilton*, 2014 S.D. 76, ¶ 39, 855 N.W.2d at 867 (quoting *Weiss v. Van Norman*, 1997 S.D. 40, ¶ 13, 562 N.W.2d 113, 116-17). "Causation is generally a question of fact for the jury except when there can be no difference of opinion in the interpretation of the facts." *Id.* (quoting *Weiss*, 1997 S.D. 40, ¶ 13, 562 N.W.2d at 116-17). "It must be a clear case before a trial judge is justified in taking these proximate cause issues from the jury." *Cowan Bros., L.L.C. v. Am. State Bank*, 2007 S.D. 131, ¶ 22, 743 N.W.2d 411, 419 (quoting *Luther v. City of Winner*, 2004 S.D. 1, ¶ 24, 674 N.W.2d 339, 348). Moreover, "[a] mere surmise that a party will not prevail at trial is not a sufficient basis to grant summary

judgment." *Colonial Ins. Co. of California v. Lundquist*, 539 N.W.2d 871, 873 (S.D. 1995).

[¶17.] Appellants argue that the evidence, including the opinions of their experts, created a question of fact on causation. Appellants also point to this Court's decision in *Van Zee v. Sioux Valley Hosp.*, 315 N.W.2d 489, 495 (S.D. 1982), where the Court stated that circumstantial evidence may be sufficient to create an inference of causation, even though it does not negate the "existence of remote possibilities that the injury was not caused by the defendant." TAS argues that Tjaden's expert opinions were not reliable under SDCL 19-19-702 because he was unable to provide an opinion as to the amount of carbon monoxide in the vehicle when Appellants were present or the rate at which the carbon monoxide may have dissipated before the fire department arrived. TAS also argues that Dr. Eide was unable to provide an opinion on the exhaust source that caused the carbon monoxide exposure. TAS claims the circuit court properly dismissed the claims as a matter of law on causation because the question of causation is outside the common experience of a layperson.

[¶18.] In considering the necessity of expert testimony to show causation between the defect and the injury to the plaintiff in a products-liability case, this Court has stated:

> In particular, a plaintiff must set forth sufficient evidence establishing a causal connection between the design defect and the resulting injury. We do not require that plaintiff eliminate all other possible explanations of causation that the ingenuity of counsel might suggest. . . . However, unless it is patently obvious that the accident would not have happened in the absence of a defect, a plaintiff cannot rely merely on the fact that an accident occurred. It is not within the common expertise

of a jury to deduce merely from an accident and injury that a product was defectively designed.

*Burley v. Kytec Innovative Sports Equip., Inc.,* 2007 S.D. 82, ¶ 28, 737 N.W.2d 397, 407 (citations omitted).

[¶19.] We initially note that this is not a case where Appellants failed to present any expert opinions on causation. Tjaden's report and deposition and the deposition of Dr. Eide were presented as part of the summary judgment record. TAS argued to the circuit court that Tjaden's opinions were not reliable but did not file a formal *Daubert* motion or a motion to strike any of the expert opinions on summary judgment. In ruling on the summary judgment motion, the circuit court stated that "Tjaden isn't providing additional evidence that's solid enough." It is unclear whether the circuit court was concluding that some of Tjaden's opinions were unreliable under Rule 702 or that Tjaden's opinions did not present sufficient evidence of causation to survive summary judgment. Moreover, the circuit court failed to conduct a *Daubert* analysis as to the relevance or reliability of any of Tjaden's opinions under Rule 702.[2]

---

2. This Court has stated that "[t]he purpose of a *Daubert* hearing is to determine whether the offered 'expert testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Burley,* 2007 S.D. 82, ¶ 25, 737 N.W.2d at 406 (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469). Unlike *Burley*, it is unnecessary to remand the *Daubert* issues because Appellants have created questions of fact even if the challenged opinions are not considered.

We note that Tjaden's report included a number of conclusions about how the Appellants may have been exposed to carbon monoxide in the vehicle because of the faulty exhaust system. He also provided several opinions about the general nature of carbon monoxide, symptoms associated with acute exposure, the risks of carbon monoxide exposure in vehicles, and the design of vehicle exhaust systems to reduce the risk of exposure. TAS is challenging

(continued . . .)

[¶20.]     TAS has not raised any issue, for the purpose of this summary judgment proceeding, concerning Dr. Eide's medical opinions. Dr. Eide testified that he could not provide an opinion whether the vehicle exhaust caused the carbon monoxide poisoning and acknowledged that the carbon monoxide exposure could have come from multiple sources. However, Dr. Eide's opinions and the hospital records show Appellants were exposed to carbon monoxide and sustained their injuries from this exposure. The questions remain whether Appellants have generated questions of fact that the muffler was missing at the time of the sale, and whether Appellants' carbon monoxide exposure was caused by the absence of a muffler.

[¶21.]     Here, Appellants presented the fire department records showing that the muffler on the vehicle was missing on April 1, 2014, and the exhaust ended under the back seat of the vehicle. Although there is contrary evidence in the record, viewing the evidence most favorable to Appellants shows that a question of fact exists whether this condition existed at the time TAS sold the vehicle to Garrido and Hoof. From the time Garrido and Hoof took the vehicle for a test drive until April 1, 2014, the vehicle was extremely loud and there was a smell of exhaust or gasoline. The evidence shows that after the purchase, Appellants rolled the windows of the vehicle down while driving because of the smell. There is also evidence that Hoof complained of headaches while riding in the car.

_____

(. . . continued)
        the former opinions by Tjaden as unreliable. It does not appear that TAS challenges Tjaden's latter opinions.

[¶22.]     Further, even assuming Tjaden's challenged opinions are inadmissible, the evidence also creates a question of fact whether the condition of the exhaust system caused Appellants' carbon monoxide exposure. TAS is not challenging Tjaden's opinions that carbon monoxide is colorless and odorless, or that vehicle exhaust contains carbon monoxide that can have an acute physical impact and can be deadly to humans. TAS also does not challenge Tjaden's opinions that vehicle exhaust systems are designed so that the exhaust is expelled behind the back wheels away from any openings in the passenger compartment, and that because the tailpipe ended under the backseat of the subject vehicle it would make it more likely that carbon monoxide would enter any openings in the passenger compartment.

[¶23.]     On April 1, 2014, Appellants sat in the parked vehicle with the engine running and windows rolled down for 30 to 45 minutes. Appellants later rolled the windows up when it started to rain. M.I. first began exhibiting symptoms of carbon monoxide poisoning after he had been sitting in the vehicle with it running for an extended period of time. M.I.'s symptoms improved after exiting the vehicle for a period of time. As soon as the Appellants returned to the car, M.I.'s symptoms worsened; he experienced a seizure and stopped breathing. All three of the Appellants were diagnosed with carbon monoxide poisoning and had high levels of carbon monoxide in their bodies immediately after exiting the vehicle. M.I. also smelled of exhaust fumes. Shortly thereafter, the fire department discovered that because of the missing muffler the exhaust system ended near the backseat of the vehicle where M.I. was seated. M.I. had nearly twice the levels of carbon monoxide

in his body as compared to Hoof and Garrido, who were both seated in the front seat. There is no evidence that anyone living in the Appellants' home or others with Appellants that day sustained carbon monoxide poisoning.

[¶24.]     Despite this evidence, TAS argues that expert testimony was necessary to show that the levels of carbon monoxide were toxic when Appellants were present in the vehicle. TAS claims that a jury would only be able to speculate whether the vehicle exhaust caused the carbon monoxide exposure because the levels of carbon monoxide inside the vehicle when tested at the hospital were not high enough to have caused an acute exposure. TAS also points to the evidence that the levels of carbon monoxide did not increase after the fire department ran the vehicle with the windows and doors closed for two minutes. On this record, an exact measure of the carbon monoxide levels in the vehicle at the time of the exposure are not essential to create a jury question. The medical evidence that Appellants were suffering from carbon monoxide exposure, the condition of the vehicle exhaust system, and the timing and circumstances of Appellants' reporting to the hospital with these injuries allow a fact finder to conclude that the defective exhaust system was probably the instrument that caused the exposure. In a context such as this, TAS has not presented any case suggesting that causation can only be established by presenting expert testimony that the levels of carbon monoxide in the passenger compartment were toxic while Appellants were sitting in the vehicle.

[¶25.]     TAS cites *Macy v. Whirlpool Corp.*, 613 F. App'x 340, 341-42 (5th Cir. 2015), in support of its claim that expert testimony is needed to show causation in this case. *Macy* affirmed summary judgment on plaintiffs' claims that they

experienced physical symptoms from exposure to low levels of carbon monoxide from a recently purchased gas stove. *Id.* at 341-42, 345. Unlike this case, there was no medical evidence that plaintiffs' symptoms were caused by exposure to carbon monoxide as plaintiffs' blood levels for carbon monoxide tested within normal ranges. *Id.* at 341. Lacking medical evidence, plaintiffs sought to present expert testimony showing that prolonged exposure to low levels of carbon monoxide could cause their symptoms, even in the absence of elevated levels of carbon monoxide in their blood. *Id.* at 342-45. *Macy* determined such opinions were unreliable and granted summary judgment because plaintiffs failed to show their symptoms were caused by carbon monoxide exposure. Unlike *Macy*, the evidence here shows that Appellants were exposed to carbon monoxide from an exhaust and that this exposure caused their injuries.

[¶26.] TAS also cites *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996), which is also a chronic-exposure case and distinguishable from the instant case. In *Wright*, plaintiffs living in the vicinity of a fiberboard-manufacturing plant sued, claiming the wood fiber emitted from the plant contained formaldehyde that was causing headaches, sore throats, watery eyes, dizziness, and shortness of breath. *Id.* The Eighth Circuit reversed a jury verdict for the plaintiffs, determining as a matter of law that plaintiffs failed to establish proximate cause for their injuries. *Id.* at 1106-07. Applying Arkansas law, the court held that a plaintiff in a toxic-tort case must prove both general causation (that the substance at issue is dangerous to humans) and specific causation (that the plaintiffs were actually exposed to the substance). *Id.* The court determined

that plaintiffs presented evidence that wood fibers from the plant were found in plaintiffs' homes, sputum, and urine. *Id.* at 1107. But there was no expert testimony to show that the wood fibers contained hazardous levels of formaldehyde, or expert testimony connecting the ingestion of the fibers with their symptoms. *Id.* at 1107-08.

[¶27.]     In commenting on causation, the *Wright* court stated,

> [w]e do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery.

*Id.* at 1107. Here, Appellants presented expert testimony that they were exposed to, and suffering from, carbon monoxide poisoning on April 1, 2014. Taken in the light most favorable to Appellants, there is sufficient evidence in the record for a jury to conclude that the defective exhaust system probably caused Appellants' carbon monoxide exposure. The circuit court therefore erred in granting TAS's motion for summary judgment on causation. Because the circuit court did not reach the liability issues, we remand the liability issues for the circuit court to resolve by summary judgment and/or trial.

### 2. *Whether the circuit court erred in denying Appellants' request for fees incurred by their expert in preparing for a deposition noticed by TAS.*

[¶28.]     Appellants argue it was error for the circuit court to deny the motion to require TAS to pay Dr. Eide for some of the time he spent before and after TAS noticed his deposition. Following his deposition, Dr. Eide sent a bill to Appellants' counsel for $2,750. This was in addition to the $375 bill for the actual deposition

time paid by TAS. The $2,750 bill represented five and one-half hours of work at a rate of $500 per hour and included time spent both before and after the deposition. Dr. Eide later separated this bill, charging Appellants $750 for one and one-half hours of time for communicating with Appellants' counsel and for "non-deposition time with legal counsel before and after the deposition." Dr. Eide billed the remaining $2,000 to TAS, which TAS refused to pay. Appellants' counsel then paid both the $750 bill and the $2,000 bill.

[¶29.] Appellants aver that the $2,000 bill represented time associated with preparing for the deposition and responding to TAS's discovery request. TAS argues it is not responsible for additional expert fees beyond the deposition time because TAS did not ask Dr. Eide to make special preparations for the deposition. TAS asserts the deposition consisted only of questions regarding Dr. Eide's opinions and his basis for them. TAS also argues this was time spent by Dr. Eide formulating his opinions on behalf of Appellants as Dr. Eide had not expressed or begun formulating his opinions until the deposition was noticed.

[¶30.] A circuit court's discovery orders are reviewed for an abuse of discretion. *Voorhees Cattle Co., LLP v. Dakota Feeding Co., LLC*, 2015 S.D. 68, ¶ 8, 868 N.W.2d 399, 404. SDCL 15-6-26(b)(4)(E) provides that:

> Unless manifest injustice would result, (i) the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery under subdivisions (4)(A)(ii) and (4)(B) of this section; and (ii) with respect to discovery obtained under subdivision (4)(A) (ii) of this section the court may require, and with respect to discovery obtained under subdivision (4)(B) of this section the court shall require, the party seeking discovery to pay the other party a fair portion of the fees and expenses reasonably incurred by the latter party in obtaining facts and opinions from the expert.

[¶31.] The plain language of the statute requires the circuit court to order the party seeking discovery from an expert to pay a "reasonable" fee for "time spent in responding to discovery." But the statute does not further define those terms. In ruling on Appellants' motion to determine expert fees, the circuit court stated:

> as to the expert witness, I think defense is only liable for the time spent in the deposition. I think we're entering in an arena here where, you know, this case, the dollar amounts are not huge, but, in any case, you could have phenomenal amounts of time spent working on it, *impossible to discern.* I think even, frankly, sometimes the costs of experts appearing just for the depositions is fairly astronomical, frankly. But I'm not going to grant any other payment regarding that expert.

(Emphasis added.)

[¶32.] In an affidavit to the circuit court, Appellants' counsel submitted a copy of Dr. Eide's initial $2,750 bill but not a copy of the $2,000 for which they seek payment from TAS. Appellants did not present any other evidence showing there was an agreement between counsel for reimbursement of Dr. Eide's time or showing the amount of time that Dr. Eide actually spent "responding to discovery" from TAS. We agree with the circuit court that it is "impossible to discern," on this record, whether the time outside the deposition was spent formulating opinions for the Appellants or "responding to discovery" of TAS. Therefore, we cannot say the circuit court abused its discretion by denying the request to have TAS reimburse $2,000 paid by Appellants to Dr. Eide.

## Conclusion

[¶33.] The circuit court erred in granting TAS's motion for summary judgment on the issue of causation. We reverse and remand for the circuit court to resolve the outstanding issues on summary judgment and/or at trial as the court

-17-

#28390

deems appropriate.  We affirm the circuit court's denial of the request to assess any additional expert fees to TAS.

[¶34.]        GILBERTSON, Chief Justice, and ZINTER and SEVERSON, Justices, and THEELER, Circuit Court Judge, concur.

[¶35.]        THEELER, Circuit Court Judge, sitting for KERN, Justice, disqualified.